Barbara Bell JOHNSON, Appellant

v.

The STATE of Texas.

No. PD–0534–05.

Court of Criminal Appeals of Texas.

June 13, 2007.

L. Charles Van Cleef, Longview, for Appellant.

Randal Lee, Crim. D.A., Linden, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court, in which KELLER, P.J., WOMACK, KEASLER, HERVEY and HOLCOMB, JJ., joined.

Appellant called 911 and asked the police to come to her home because she had just shot her husband in self-defense. The police came and found her husband dead on the living room floor. While appellant sat in a patrol car, officers conducted a preliminary investigation, took photographs, made notes, and gathered up the appellant's gun. At trial appellant argued that the evidence obtained during this initial investigation should be suppressed because the officers did not have a warrant. The court of appeals held that the officers were entitled to enter appellant's home twice under the emergency aid and protective sweep doctrines, and that the officers could testify to the evidence they had seen in plain view at that time.[1] The court also held that the officers' third warrantless entry into the home was illegal, and that the spent shell casing they seized during that entry was improperly admitted, but that its admission was harmless.[2] In this Court, appellant argues that "the court of appeals erred in failing to overrule the

---

1. *Johnson v. State,* 161 S.W.3d 176, 180 (Tex. App.-Texarkana 2005).

2. *Id.*

district court's denial of petitioner's motion to suppress evidence obtained as a result of an illegal general search of her home." We conclude that the trial court's original rationale for overruling appellant's motion to suppress was correct: By calling 911 and asking the police to come to her home, appellant consented to the police entry and to their initial investigation of the death of her husband. Therefore, we affirm the judgment of the court of appeals, but on a different rationale.

## I.

Appellant called 911 shortly before midnight. She was hysterical. She kept saying, "Come, come. I killed him." She told the dispatch operator, "Sweetheart, come on." The dispatch operator said, "I can't come if you don't tell me where you are." Appellant gave directions on how to find her house, ending with "I'm the third house on the right." Then she said, "I need to get my clothes on. I need to get dressed." She kept repeating, "I just shot my husband." She said she shot him "through the heart." She cried that he had beaten her, and now "he cannot do this to me anymore.... I just killed that son of a bitch." When asked what kind of a gun she used, she told the dispatcher that it was a "380." When the dispatch operator asked her if her husband was still alive and to check his pulse, she said, "I'm afraid to touch him. If he's alive, he'll kill me." Later she exclaimed, "He twitched," and "he's like a bull of a man." She cried impatiently, "Come on, baby, bring someone out here to me." When the dispatch operator told her that "They're on the way," she said "I called people before and I never pressed any charges.... Somebody come here." The dispatcher told her,

"Present yourself in the doorway with your hands up, okay, because [the officers] won't know if you don't have that gun or not." The dispatch officer then asked, "Do you live by the radio station?" "No, no. It's farther down.... Let me tell you how to get to my house.... I have my lights on.... I'm at the door." The dispatcher said, "Do not go to that door with that gun." When the dispatcher finally told her, "There is an officer on your street right now. I need you to stand on your front porch," appellant responded, "I don't have a porch. I'll stand in my garage.... He's coming, he's coming." And Officer Jones then arrived.

Officer Jones handcuffed appellant for safety's sake, placed her in his patrol car, and went inside to find appellant's dead husband. He made a brief protective sweep of the house and saw the .380 pistol that appellant had used to shoot her husband on the kitchen counter. He came back outside and called the paramedics. They arrived shortly thereafter, and they all went back inside the home. About fifteen minutes later, investigators from the sheriff's office arrived and moved appellant to another patrol car because Officer Jones had to leave. The sheriff's deputies went inside appellant's home to begin an initial investigation into the shooting. While the patrol video and audio camera recorded her,[3] appellant continued to explain why she shot her husband and asked one of the officers, "Is there anything you want me to show you or tell you or anything in that house? I'll do it. I mean I know the house." At no time did she suggest that she wanted the officers to get out of her house or to end their crime scene investigation.

---

**3.** Although both the video and audio were running, the video camera was pointed toward the front windshield, so only appellant's voice was heard as she was seated in the backseat of the patrol car.

During the midtrial suppression hearing outside the presence of the jury, appellant argued that the "emergency aid doctrine"[4] would not permit the officers to make their third warrantless entry into appellant's home. It was during this entry that they collected her gun and a spent shell casing, took photographs of the living room and bedroom, and made measurements of the rooms.[5] Although he also addressed the emergency aid doctrine, the trial judge focused primarily on the issue of consent. He asked, "Well, what do you make of the defendant's statement on the tape where she volunteers to the officer, 'Do you want me to go back in and show you where we were standing and that sort of thing?'" He later said,

And I do think that the defendant's statement, though it was made in custody, I think it's clear from the tape that it was a voluntary statement. In fact, after she had invoked her right to counsel and the lieutenant left her alone in the car, she called him back to the car to specifically ask him if he wanted her to go into the house and help him, to show him where some things were and where they'd been standing and that sort of thing. So I think it was clear and unequivocal that she was voluntarily consenting to help him perform a search of the house.

The trial judge denied the motion to suppress evidence, ruling that (1) appellant had consented to the search, and (2) in any event, the majority of the evidence obtained was admissible because it was in plain view when Officer Jones first entered appellant's home and conducted a lawful protective sweep of the area.

After hearing all of the evidence, the jury rejected appellant's claim of self-defense[6] and found her guilty of murder. It sentenced her to fifteen years' imprisonment.

The court of appeals affirmed the conviction and sentence. Appellant once again argued the "emergency aid doctrine," so the court of appeals focused upon that issue. It held that Officer Jones was justified in his first two entries into appellant's home "under the emergency aid and protective sweep doctrines, to determine whether anyone inside the house needed assistance or endangered anyone else" and to confirm the death of appellant's husband.[7] "What was seen in plain view during those two legitimate entries was properly the subject of testimony by

---

**4.** *See Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

**5.** Officer Copeland testified that when he entered appellant's home at about 12:45 a.m., he saw little sign of a disturbance other than the coffee table being slightly askew. He did not find any evidence of a weapon that the deceased might have used. He stated that the placement of the coffee table, the victim's body, contact blood on the floor, and transfer blood on a chair pillow indicated that the deceased was shot while sitting in the chair and that he had then slumped over or tried to stand up but hit the coffee table as he fell to the floor.

**6.** Appellant testified that her husband had verbally and physically abused her on many

occasions. She said that "he had been pushing me and slinging me around like a rag doll." She skinned her elbow as a result of his knocking her up against the corner of the fireplace. Appellant said that she had bought the .380 years ago and kept it stored in her car, her bedroom, or the living room. She said that she and her husband had been arguing about money that evening and that "[h]e told me he was going to break my neck, and he came up out of the chair and started toward me" so she picked up the gun from the fireplace mantel, began to run from him, and shot him without looking. She testified that she intended to shoot him, but that she did not mean to kill him.

**7.** 161 S.W.3d at 181.

the individuals who participated in those entries."[8] The court of appeals then stated that the third entry was not authorized by the emergency aid doctrine, and thus the evidence collected during that entry was inadmissible to the extent that it had not been in plain view during the first two entries.[9] However, the court of appeals concluded that the admission of this evidence was harmless beyond a reasonable doubt because "[t]he only ultimate issue before the jury was whether the shooting was in self-defense," and the "improper evidence was simply where the spent shell casing came to rest behind a chair."[10]

The court of appeals did not address the trial judge's first ruling: Appellant consented to the limited investigatory search of her home. We address that issue and determine that the trial judge did not err in denying appellant's motion to suppress.

## II.

■ The Fourth Amendment protects individuals "against unreasonable searches and seizures."[11] A warrantless police entry into a person's home is presumptively unreasonable unless it falls within the scope of one of a few well-delineated exceptions. One such exception is a consensual entry.[12] Typically, whether consent is voluntary turns on questions of fact and is determined from the totality of the circumstances.[13] For that reason, a finding of voluntary consent is reviewed only for an abuse of discretion.[14] The operative inquiry is whether the evidence presented at the suppression hearing fairly supports the trial court's finding of voluntary consent by clear and convincing evidence. The standard for measuring the scope of consent "is that of 'objective' reasonableness" or what the ordinary reasonable person would have understood under the same circumstances.[15]

■ Numerous courts across the nation have addressed the scenario in which someone calls 911 and requests police to come to his home (or apartment, hotel room, or other location) because of an emergency or to investigate a crime.[16] In

8. *Id.*

9. *Id.* at 185–86.

10. *Id.* at 187.

11. U.S. Const. amend. IV.

12. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

13. *Id.* at 227–29, 93 S.Ct. 2041 (concluding that "voluntariness is a question of fact to be determined from the totality of all the circumstances").

14. *See Montanez v. State*, 195 S.W.3d 101, 108 (Tex.Crim.App.2006) (holding that the reviewing court must decide whether, "after affording almost total deference to the trial court's determination of historical facts that are supported by the record, the trial court abused its discretion by finding that the State proved by clear and convincing evidence" that a defendant voluntarily consented to a search).

15. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

16. *See, e.g., State v. Flippo*, 212 W.Va. 560, 575 S.E.2d 170, 178–83 (2002) (collecting cases; "hold[ing] that when a person summons the police to a dwelling he/she owns, possesses, or controls, and that person states that a crime was committed against him/her or others by a third person at the premises, he/she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator, absent a contrary limitation imposed by the person summoning the police"); *State v. Fleischman*, 157 Ariz. 11, 754 P.2d 340, 341, 344 (1988) (same; when deceased's husband (or someone acting at his request) called 911, told them that his wife had been shot at their restaurant, and asked for help, court found implied consent for a two-hour search of restaurant while defendant-husband was taken for questioning and fingerprinting "to eliminate him as a sus-

*Brown v. State*,[17] this Court discussed extensively the issue of "implied" consent to search in this situation. The evidence in *Brown* showed that the defendant called the police (and others) to say that he had just found his wife dead in their detached garage.[18] He asked the police dispatcher to send a squad car and ambulance to his home, and he said that someone must have "robbed his wife because her purse was missing."[19] When the police arrived, they escorted him to a patrol car "to calm down and stay warm until the investigators could speak with him."[20] The defendant talked with the investigators and discussed his activities earlier that day while other officers searched the house, photographed the inside, and examined the contents of a purse in the bedroom.[21] In *Brown*, we cited and summarized numerous decisions from other states and concluded that, by calling 911 to report his wife's murder in their garage and requesting police and ambulance assistance, the search of the defendant's house "was a search pursuant to implied consent."[22] In sum, when a homeowner makes a 911 call and requests immediate assistance because of an emergency, he is indicating his consent to (1) the arrival and entry of the responding officers to resolve that emergency and, (2) absent any evidence of the revocation of that consent, an objectively reasonable limited investigation by the responding officers into the emergency that the homeowner reported.

### III.

■ The primary difference between the situation in *Brown* (and in several of the other cases cited in *Brown*) and the present one is that in many of those cases, the defendant "either states or suggests that [the crime] was committed by a third person."[23] In the present case, appellant did not suggest that someone else killed her husband; from the very beginning she announced that she had shot "the son of a bitch" because he beat her and she wasn't going to take it any more. Throughout, her position has been that she acted in self-defense. We do not see how the fact that she claimed self-defense when she called 911 rather than saying that a third person had shot her husband would make her consent to come into her home to assist her any less valid. This is a factual difference without a legal distinction in this particular case. Whether the 911 caller says that a third person shot the deceased or that she justifiably or accidentally shot the deceased, the caller's position is self-exculpatory, and she seeks immediate aid.[24] Here appellant screamed and

pect"); *Thompson v. State*, 384 N.W.2d 461, 463–64 (Minn.1986) (same); *see* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 8.1(*l*) at 122 & n. 322 (4th ed.2004) (citing *Brown* and *Flippo* as example of "unobjectionable instances of actual consent being established by circumstantial evidence").

17. 856 S.W.2d 177 (Tex.Crim.App.1993).

18. *Id.* at 179.

19. *Id.*

20. *Id.*

21. *Id.* The officers originally thought that the purse belonged to the defendant's deceased wife, but, in fact, it belonged to the defendant, and it contained a cash register receipt that helped prove that the defendant's exculpatory story was false. *Id.*

22. *Id.* at 180–83.

23. *Id.* at 182.

24. *See, e.g., Steigler v. State*, 277 A.2d 662, 667 (Del.1971) (defendant appeared fully cooperative with police who arrived to investigate his burning home in which three people had died; "One can hardly expect the police to get a search warrant for a house or building when the owner is obviously cooperative and gives every appearance of being the victim,

begged for the police to come to her home, she repeatedly provided them with directions, she repeatedly told them that she had shot her husband as she was urging them to hurry to her assistance. They did exactly what she asked them to do. This is not illegal conduct. Because appellant was still at the scene as the officers continued to investigate and saw them going into her home, she was clearly in a position to revoke her consent had she wished to do so. She did not; she did the opposite. She offered to go back into her home with the officers and help them.[25]

■ A second possible difference between *Brown* and the present situation is that appellant claims that the police made three "separate" entries into her home. In *Brown*, the officers entered and never left until they were done with their investigation. Although the officers in the present

case may have gone in and out of the door three times during their initial investigation, the lawfulness of a search is not determined by the number of times that officers cross the threshold. Rather, it is whether the officers are engaged in objectively reasonable conduct under the circumstances.[26] Here, appellant apparently claims that the police, having responded to appellant's 911 call, come into her house, taken a look around, should have left her deceased husband on the floor while they departed to obtain a search warrant even though she had asked them to come and never suggested that they leave. When we stated in *Brown*, "This implied consent[27] is valid only for the initial investigation conducted at the scene and does not carry over to future visits to the scene,"[28] we were not speaking of the number of times that an officer stepped over the

---

rather than the perpetrator, of a crime."), *vacated on other grounds,* 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972); *State v. Fredette,* 411 A.2d 65, 67–70 (Me.1979) (consensual search when defendant frantically called police and reported that someone had just shot her husband and then fully cooperated with responding officers; "[h]er conduct throughout conveyed only approval and encouragement of the police in their search"); *State v. Koedatich,* 112 N.J. 225, 548 A.2d 939, 956–58 (1988) (when defendant called police and reported that he had been stabbed while driving his car, court found "implied voluntary consent" to seize and search his car for evidence relating to that stabbing; defendant initiated the police contact and adopted a " 'cooperative posture in the mistaken belief that he could thereby divert or prevent police suspicion of him' ").

**25.** *See Fredette,* 411 A.2d at 68 (rejecting defendant's argument that she did not consent to later warrantless entries into her home after she had called police for immediate assistance for her dying husband; noting that, after she was "informed that the officers were in the process of searching her home, Mrs. Fredette then said, '[If] you find anything out there, would you let me know?' At no time during this conversation did Mrs. Fredette

indicate any objection to the continued search of her home but, to the contrary, indicated a desire to know what the results might be.").

**26.** The Supreme Court recently reiterated in *Brigham City v. Stuart,* —— U.S. ——, ——, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650 (2006), that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.' " *Id.* (quoting *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)). In *Brigham City,* as in the present case, officers who made a warrantless entry into a private home acted reasonably under the circumstances. In that case, the officers entered the home under the "emergency aid doctrine," while here the officers entered both to provide emergency aid and with appellant's consent.

**27.** We agree with Professor LaFave, that a homeowner's 911 call requesting immediate assistance at his home is not an example of "implied" consent to enter the home, it is "actual" consent shown by circumstantial evidence. 4 LaFave, § 8.1(*l* ) at 122 & n. 322.

**28.** *Brown,* 856 S.W.2d at 182.

threshold during that initial investigation. Instead, we were referring to later distinct "visits" to the home after the initial investigation (and removal of the body in a fatal shooting) is complete.[29]

The *Brown* caveat ("that the individual either states or suggests that it was committed by a third person") might well act as an appropriate brake upon the *scope* of a law enforcement search when the owner of the premises affirmatively summons police. But the responding officers' search in this case was limited in scope and objectively reasonable under the circumstances.[30] These officers did not rummage through closets, open drawers, paw

through purses, or otherwise invade appellant's privacy interests in her home.[31] They came when she called and did nothing other than find her husband's body, take photographs of the living-room shooting scene and their bedroom, collect the gun with which appellant said she used to defend herself, and gather up a shell casing from that gun. All of these items, except the shell casing, were in "plain view" during their initial, cursory investigation of the fatal shooting and are activities entirely consistent with any initial shooting investigation.

The situation might well be different had the scope of the search of appellant's

**29.** *See, e.g., Michigan v. Tyler,* 436 U.S. 499, 509–11 & n. 6, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) ("In determining what constitutes a 'reasonable time to investigate,' appropriate recognition must be given to the exigencies that confront officials serving under these conditions, as well as to individuals' reasonable expectations of privacy"; concluding that an entry into a home to fight a fire requires no warrant, "and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches.").

**30.** *See Fredette,* 411 A.2d at 69. In *Fredette,* the appellate court rejected the defendant's contention that her frantic call to police asking them to assist her husband who had been shot in their home did not constitute consent to search her home later that day for additional evidence.

> The defendant not having expressly limited her consent to the police presence to either time, space, or purpose, we must consider whether the police who responded to her plea for assistance should have understood from all the circumstances that Mrs. Fredette desired only a limited search of her home. We conclude that knowing all of the existing factual circumstances, the police could reasonably understand that Mrs. Fredette had placed no limitation upon her consent for the search of her home.

*Id.* The court quoted from an earlier case, *State v. Koucoules,* 343 A.2d 860, 868 (Me. 1974), concerning the proper scope of a consensual search:

> A consent search is a limited and conditional search only insofar as the consenting party has expressly stated, or, under the reasonable man standard in the light of all the existing circumstances, is deemed in fact to have impliedly attached, certain limitations under which the officers are authorized by him to search. The character of the search is determined by the scope of the authorization as understood by reasonable men having knowledge of all the existing factual circumstances, and not by any limitational rule of law applicable to all consent searches.

**31.** *Compare Mincey v. Arizona,* 437 U.S. 385, 389, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (officer's "emergency" search of shooting scene "lasted four days, during which period the entire apartment was searched, photographed, and diagramed. The officers opened drawers, closets, and cupboards, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of the carpet and removed them for examination. Every item in the apartment was closely examined and inventoried, and 200 to 300 objects were seized. In short, Mincey's apartment was subjected to an exhaustive and intrusive search. No warrant was ever obtained.") (footnote omitted).

home been more intrusive than that found legal in *Brown*. There the police responded to a shooting death in the defendant's detached garage, but the officers searched inside the defendant's purse (mistakenly thinking it belonged to the deceased who appellant said might have been the victim of a robbery) located in the bedroom inside the house proper. The privacy interest invaded in *Brown* was significantly greater than that in the present case. Arguably, a homeowner who makes a 911 call reporting a shooting and asking for immediate police assistance does not, by that single act, consent to the responding police searching through his bedroom belongings. But by making such a call, surely the objectively reasonable homeowner envisions that the responding police will enter his home, view the scene, take pictures of that scene, and make a cursory search for relevant evidence directly relating to the homeowner's emergency call.[32]

Under these circumstances, we uphold the trial court's denial of appellant's motion to suppress based upon her consent to search. Consent was one of the two bases for the trial judge's ruling,[33] and he was legally and factually correct. We therefore affirm the court of appeals's judgment.

JOHNSON, J., filed a concurring opinion in which MEYERS and PRICE, JJ., joined.

JOHNSON, J., concurring.

The record shows that, in response to a 9–1–1 call reporting a shooting, Eric Jones, a police officer in Atlanta, Texas, arrived at appellant's home and found her at the door to the house in an agitated state and still on the telephone with the 911 operator. For security, Jones handcuffed appellant and seated her in the back seat of his patrol car. He then made the first entry into the house and saw a pistol laying on a kitchen counter and appellant's husband lying on the living-room floor in front of a fireplace. Emergency medical personnel arrived shortly thereafter and, with Jones, made a second entry into the home. Somewhat later, sheriff's deputies arrived and made a third entry to process the crime scene. There is no dispute that this entry and search were conducted without a warrant.

During the third entry, investigators took photographs of the inside of the home and seized the pistol from the kitchen counter and a spent shell casing that was discovered between a chair and the wall in the living room. Appellant filed a motion to suppress the evidence that had been obtained at the scene without a warrant. The objection was based on the Fourth Amendment to the United States Constitution, Article I, Section 9, of the Texas Constitution, and "the correlative provisions of the Texas Code of Criminal Procedure." The trial court overruled that motion, saying that the majority of the challenged evidence was "nothing more than what Officer Jones could have testified to as having been his personal observation of things in plain sight. . . ." The trial court also noted that appellant, while the search on the third entry was in progress, asked Copeland if there was anything in the house that he wanted her to

---

**32.** *See Brigham City*, 126 S.Ct. at 1947 (noting that "the ultimate touchstone of the Fourth Amendment is 'reasonableness' ").

**33.** It was appellant, not the trial judge, who relied upon *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) and its "emergency aid doctrine." The court of appeals simply followed appellant's lead in its analysis rather than the lead of the able trial judge.

show him. It then opined that appellant's question constituted a consent to search.[1]

Appellant filed a petition for discretionary review. This Court granted ground one, which asserts that the court of appeals erred in affirming the trial court's denial of appellant's motion to suppress the evidence that was obtained as a result of an illegal general search of her home.

### The Pre-trial Motion to Suppress

Several months before the trial on the merits began, appellant filed a written Motion to Suppress Statements of Defendant and Evidence. That motion sought to suppress the statements that appellant had made to any law-enforcement officer and any evidence confiscated by a law-enforcement officer, including evidence that flowed from the search, including testimony from the medical examiner and the trace-evidence examiner.[2] The motion generally alleged that her statements and the evidence seized at the scene were results of an illegal search of appellant in violation of her constitutional and statutory rights. The docket sheet contains a notation: "Pretrial suppression issue to be carried to the time of trial."

Just before the state began presenting its case, appellant re-urged her suppression motion, objecting to the admission of any physical evidence that was obtained during the third entry into the house. The trial court noted the docket-sheet entry about the pretrial suppression issue being carried until the time of trial and decided that it would allow the state to introduce the evidence that appellant had objected to, carry the objection, and hear more argument when court recessed. After the jury was excused for the day, the trial court considered the suppression issue.

Appellant and the state stipulated that the search of appellant's residence during the third entry was done without a warrant and that no warrant was ever obtained for the search. Appellant argued for suppression of all of the evidence, including observations, diagrams, and photographs of the scene, that was obtained after Jones and the paramedics left the house after the second entry. After hearing argument from both parties and then reviewing case law overnight, the trial court denied the motion.

Appellant acknowledges that "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Appellant argues that, after the protective sweep by Jones and the paramedics' determination that her husband was dead, the third entry into the home without a warrant was improper and that

---

1. It is undisputed that, at the time appellant asked her question, the search was already underway. Although lack of consent was argued in appellant's brief to this Court, the court of appeals did not address the issue. "Consent" obtained after the fact cannot justify failure to obtain a warrant. Consent must also be clearly expressed. *Allridge v. State*, 850 S.W.2d 471, 493 (Tex.Crim.App.1991)(consent must be positive and unequivocal). Appellant's question did not constitute consent to the search that was already in progress.

2. At trial, appellant affirmatively stated she had "no objection" as to the autopsy report, the autopsy photograph, the ballistics report, and the trace-evidence report on the victim's clothing. The ballistic and trace-evidence reports each make reference to the pistol. Appellant initially objected to a diagram of appellant's home prepared by officers involved in the third entry, but later offered the diagram as defense exhibit 2.

the fruits of that improper entry and search should have been suppressed.

The state, citing *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), argues that the "emergency aid doctrine" and the prompt "protective sweep" exceptions to the Fourth Amendment's warrant requirement permit police to seize evidence that was in plain view during the course of these legitimate activities. It asserts that "[i]n this case, the evidence collected at the scene was clearly admissible because it was in the plain view of a law enforcement officer during the course of his legitimate emergency activities, i.e. searching for the victim and securing the safety of the area." The state also asserts that the shell casing was within the plain view of Jones during the permissible emergency search and protective sweep.[3]

### The First and Second Entries

It is undisputed that the police made multiple entries into appellant's home. The first entry, by Jones alone, was a permissible cursory search to secure the premises. The second, by Jones accompanied by emergency medical personnel, was *to facilitate the administration of medical treatment to the injured victim*, and Jones testified that he did not do any investigation at that time, but "[j]ust made sure there was nobody else there[.]" The parties agree that the first two entries were proper.

### The Third Entry

The court of appeals noted that, to the extent that deputies searched the home's interior during the third entry, "there is no viable exception to the constitutional requirement that a search warrant be obtained[,]" thus the failure to suppress some of the disputed evidence so obtained was error. *Johnson*, 161 S.W.3d at 185. It concluded that the seized evidence, except the shell casing, had been in plain view during the previous emergency sweeps and was thus lawfully seized during the third entry. *Id.* at 186. The court of appeals also concluded that the search during the third entry was broader than the scope allowed by the plain-view exception and that the seizure of the shell casing and its fruits, testimony referring to the shell casing and the portion of the diagram showing where the shell casing was discovered, should have been suppressed in response to appellant's objections. *Id.*

Appellant takes issue only with the conclusion of the court of appeals that the evidence that was seized during the third entry, other than the shell casing, was in plain view during permissible entries and therefore was properly seized.

### Analysis

*Mincey* teaches us that there is no "murder-scene exception" to the warrant

---

**3.** The state also argues that, while appellant had previously objected to the admission of any evidence that was obtained during the sheriff's department's investigation of the scene, appellant "specifically stated that she had 'no objection' to the admission of: the autopsy report, the [autopsy] photo, or the ballistics report," and, therefore, waived her right to complain on appeal about the admission of that evidence at trial.

While stating "no objection" to the admission of the ballistics firearms report may waive any complaint about the admission of the report into evidence, it does not waive properly preserved complaints about the admission of particular pieces of evidence that are mentioned in the report. The court of appeals noted that appellant may have waived her objection as to the shell casing when her counsel affirmatively said "no objection" to the admission of the state's exhibit that contained references to the shell casing, but it also noted that the state did not raise such a claim. *Johnson, supra,* 161 S.W.3d at 186, n. 6.

requirement. "In sum, we hold that the 'murder scene exception' created by the Arizona Supreme Court is inconsistent with the Fourth and Fourteenth Amendments-that the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there." *Mincey,* 437 U.S. at 395, 98 S.Ct. 2408.

*Brown v. Texas,* 856 S.W.2d 177 (Tex. Crim.App.1993), teaches us that if a crime "is reported to the police by an individual who owns or controls the premises to which the police are summoned, *and that individual either states or suggests that it was committed by a third person,* he or she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator. *As long as the individual is not a suspect in the case* or does nothing to revoke his consent, the police may search the premises for these purposes, and evidence obtained thereby is admissible." *Id.* at 182. (Emphasis added.) That is clearly not the case here. Appellant had repeatedly confessed to shooting her husband. There was never the slightest suggestion that anyone else was involved.

It is entirely reasonable to find implied consent to search in the *Brown* circumstances, but not when there is a confession by the person who is in control of the premises. Physical evidence can be ephemeral; if not collected quickly, it may disappear. It is fair to assume that an owner who points to a third person as the perpetrator desires to have that person caught and is therefore more than willing to let the police search the premises for evidence. It is also fair to assume that such a premise may well not be true if the owner is a suspect and the search might reveal incriminating evidence.

Unless the existing circumstances support a finding that an exception to the warrant requirement is present, police must have a warrant before they may search without consent. In this case, there was no explicit consent. Under *Brown,* we may not assume implied consent in the circumstances present in this case. Appellant's offer to show the officers things in the house was made well after the search began without her consent and followed questions from her about why all those people were in her house; her offer cannot be used to justify a search that was already under way. There being no consent and no warrant, the third entry was improper.

Jones could have properly picked up the pistol on either his first or second entry, as the gun was in plain view on the kitchen counter and appellant had told him that she had shot her husband. But he did not. Jones and emergency medical technicians could have testified as to what each had personally observed during the two proper entries, but they were not called as witnesses; the state instead relied on Copeland's testimony about the photographs that were taken during the third entry. Under *Mincey* and *Brown,* the third entry was impermissible, and the trial court erred in admitting the physical evidence collected during that entry. The error is of constitutional dimension, but is not structural. The Court should, therefore, review the error under to Tex. Rule App. Proc. 44.2(a) and consider whether the error requires reversal. While I believe that the third entry was improper, I do not believe that the error was harmful.

### The Gun

The gun, a .380 caliber semi-automatic pistol, was offered and admitted as State's Exhibit 13. Its admission was improper as evidence seized during an unauthorized

search. However, appellant told Jones that she had used a .380. Jones testified that he had seen the gun on the kitchen counter during his first entry and had identified it as a .380, and the medical examiner testified that the victim died from a gunshot wound in the back and that he had removed a .380 slug from the victim's thorax. Such other evidence supports a finding beyond a reasonable doubt that the admission of the gun itself did not contribute to the conviction or punishment. For the same reasons, the erroneous admission of State's Exhibit 11, a photograph of a gun on a kitchen counter beside the stove, was harmless error.

### The Photographs

Appellant also objected to State's Exhibits 2–8, 10, 12, 19, and 25. These photographs may be divided into two groups. The first group consists of five photographs of parts of the master bedroom.

Exhibit 6 a night stand in the bedroom, purporting to show an empty handgun case

Exhibit 10 the bedspread, with an unidentified, dry stain

Exhibit 12 the door jamb in the bedroom, damaged at some unknown time

Exhibit 19 a view of the master bedroom

Exhibit 25 a view of the master bedroom

The shooting occurred in the living room. There is no evidence of a struggle, in the living room or elsewhere. No connection between the photographs of the bedroom and the murder was shown.

These photographs did not make any relevant fact more or less likely and were thus irrelevant. The trial court erred in admitting them, but I believe, beyond a reasonable doubt, that the erroneous admission of these photographs did not contribute to the conviction or punishment.

The second group consists of six photographs of the living room, the site of the shooting.

Exhibit 2–5 the victim as he was found by responding officers

Exhibit 7 a wider view of living room; the back lower two-thirds of the victim is visible

Exhibit 8 a large armchair with a red stain on the back cushion

Exhibits 2 and 3 depict the victim from the front, semi-prone on the floor, with no injury visible. Exhibits 4, 5, and 7 depict the victim from the rear and show a large, dark-red stain on his T-shirt, in the center of his back, and a dark-red streak on the carpet. None of the six photographs is particularly gory or bloody.

Appellant repeatedly admitted that she had shot her husband.[4] She so testified at trial. The issue before the jury was whether the shooting was justified as an act of self-defense. That issue was fully litigated through the testimony of appellant, the medical examiner, and various witnesses for each side who testified about the behavior of both appellant and the victim and the nature of their relationship.[5] The photographs in the second group did not reveal any fact or circumstance not included in permissible testimony by one

---

4. At different times, she told the emergency operator, Officer Jones, and Lt. Copeland that she had shot her husband.

5. It was generally conceded that both appellant and her husband were alcoholics. As would be expected, witnesses for the state testified that they had never seen the victim be violent toward anyone. Some of appellant's witnesses testified as to damage to appellant's home that was inflicted by the victim when he was angry; other witnesses, including a law-enforcement officer, testified as to prior assaults on appellant by the victim.

or more witnesses, nor were they probative of the critical issue, self-defense. They were admitted in error, but, beyond reasonable doubt, the error did not contribute to the conviction or punishment.

I concur in the judgment of the Court.

