**Opinion issued February 27, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00864-CR

———————————

## RUBEN C. GOMEZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 1564007**

---

## O P I N I O N

Appellant Ruben C. Gomez was indicted for the offense of possession of a

firearm by a felon.[1] After the trial court denied his motion to suppress evidence,

---

[1]    *See* TEX. PENAL CODE § 46.04(a).

Gomez pleaded guilty. Pursuant to a plea bargain agreement, the trial court sentenced Gomez to three years in prison. The trial court certified Gomez's right to appeal the denial of the motion.[2]

To challenge the denial of the suppression motion, Gomez raises two issue on appeal. He contends that the trial court erred in denying the motion because (1) the police did not have reasonable suspicion to detain him or probable cause to arrest him, and (2) the warrantless search of his mother's home to recover the firearm was unlawful.

We affirm.

## Background

Around midnight on September 7, 2017, Houston Police Department Officers Santuario and Valle were working undercover narcotics. The officers were in an unmarked pickup truck. Officer Santaurio was driving, and Officer Valle was in the passenger seat. En route to set up surveillance, they drove by the home of Gomez's mother. As they drove by, Officer Santaurio saw Gomez sitting on the steps of the home's brightly lit porch.

Officer Santaurio pulled the truck into the driveway of the house adjacent to the home of Gomez's mother to turn the truck around. When he pulled into the driveway, Officer Santaurio saw Gomez walking closer, toward the officers' truck.

---

[2] *See* TEX. R. APP. P. 25.2(a)(2)(A).

Gomez had a semiautomatic handgun in his right hand. Although he was not pointing it directly at the officers, Officer Santaurio saw that Gomez was pointing the handgun in the direction of the officers' truck. Officer Santaurio later testified at the motion to suppress hearing that he considered Gomez to be displaying the handgun in a threatening manner.

Officer Santaurio shifted the truck into park. He and Officer Valle got out of the vehicle. The officers were wearing tactical gear, including vests with the word "police" on them in large letters. They pointed their flashlights at Gomez and loudly identified themselves as police. Gomez then ran into his mother's house. Gomez turned off the porch lights and shut the front door. He stayed inside for no more than five seconds and then came back outside with his hands up. The officers ordered Gomez to lie on the ground. Gomez no longer had the firearm.

Gomez's mother ("Ms. Gomez") also came out of the house. The officers detained Gomez and his mother on the front lawn, placed Gomez under arrest, and called for assistance from patrol officers.

Ms. Gomez told Officer Santaurio that Gomez's daughter was asleep in the back bedroom of the home. She said that the house was her residence and that she owned the home. She said Gomez was not renting from her, did not live there, and was staying at the home only because his daughter was there. Officer Santaurio

3

asked Ms. Gomez for her consent to search the house for weapons and for other people, and she gave her consent for the search.

When the patrol officers arrived, their body cameras recorded the scene. On the video from the body cameras, Gomez can be heard saying, "Y'all can't go in the house without no warrant." Officer Valle responded, "Fresh pursuit, man. Anybody else in the house? We gotta clear it."

The video shows the officers entering the home to conduct the search. As he is escorted to the patrol car, Gomez stated, "Y'all ain't even have no warrant." Before being placed in the patrol car, Gomez said, "Ain't nothing in that house. Y'all ain't got no warrant to go up in there. Case dismissed, [expletive]. Case dismissed."

Having obtained the consent of Ms. Gomez to search the home, Officers Santuario and Valle, along with other officers, conducted a brief "protective sweep" and search of the house. Officer Santaurio later testified that the purpose of the protective sweep was to ensure the safety of the officers at the scene, who were near the open front door, by determining whether there were other people inside the dark house and whether there were weapons that could be used against the officers.

While conducting the search, Officer Santaurio saw the butt of a handgun sticking out from the couch cushions in the living room. Officer Santaurio lifted the sofa's cushions and seized the gun. He recognized it as the handgun Gomez had had earlier in the front yard.

The officers did not know it at the time they arrested Gomez, but Gomez had a prior felony conviction for burglary of a motor vehicle. Gomez was indicted for the offense of possession of a firearm by a felon. *See* TEX. PENAL CODE § 46.04(a).

Gomez filed a motion to suppress. He requested the trial court "to suppress any evidence seized from his property and his person, any statements made by the defendant and the visual observations made by the officers." At the motion to suppress hearing, the State offered the testimony of Officer Santaurio, who testified consistently with the facts as they are set out above. The State also offered the videos from the body cameras worn by the patrol officers called to the scene by Officers Santaurio and Valle.

Gomez testified in support of the motion to suppress. His account of what occurred on the night of his arrest differed from the account provided by Officer Santaurio. Gomez testified that he was sitting on the steps of his mother's porch drinking a beer with the lights off. He had marijuana in a container and was waiting for a buyer to arrive to purchase it. Gomez acknowledged that he had a handgun in his pocket, which he kept "in case someone want[ed] to rob me." He was sitting on the steps when Officers Santaurio and Valle drove by in their truck. Gomez said that the truck was going slowly, so he stood up "to take a look." Gomez testified that the truck suddenly stopped, and the officers jumped out with rifles in their hands, yelling for him "to get on the floor." He claimed that he never took the gun out of his pocket

5

while he was outside with the officers. Gomez testified that he ran into the house to hide the gun under the seat cushions of the couch. He stated that he went back outside, and the officers handcuffed him on the ground where he stayed until he was placed in the patrol car.

Gomez also testified that, at the time of the search, his mother's house was his residence. He said that he had lived at his mother's house his entire life. He claimed that, at the time of the search, he paid some of the utility bills and paid his mother rent to live there. Gomez testified that he told the officers that they could not search the house. He also claimed that he had hidden the gun underneath the cushions of the couch and that the gun was not visible as Officer Santaurio had testified.

Ms. Gomez also testified. She acknowledged that she had given the officers permission to search her home. She also acknowledged that she had told the officers that Gomez did not live there, but she said that was not true. She testified that Gomez lived with her at the time of the search and that he paid rent to her. She said that she told the officers that he did not live there because she felt "afraid," "pressured," and "intimidated."

The trial court denied Gomez's motion to suppress. Gomez pleaded guilty to possession of a firearm by a felon. Pursuant to a plea agreement with the State, the trial court assessed Gomez's punishment at three years in prison. The trial court certified Gomez's right to appeal, and this appeal followed.

Gomez had requested the trial court to make findings of fact and conclusions of law, but none were made. On the joint motion of the parties, we abated the appeal for the trial court to make findings of fact and conclusions of law regarding its denial of the motion to suppress. After a supplemental clerk's record containing the findings of fact and conclusions of law was filed, we reinstated the appeal.

## Motion to Suppress

In two issues, Gomez challenges the trial court's denial of his motion to suppress.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). We review the trial court's factual findings for an abuse of discretion but review the trial court's application of the law to the facts de novo. *Id.* at 190. We give deference to the trial court's factual determinations because the trial court is the sole trier of fact and judge of witness credibility and the weight to be given their testimony. *Id.*; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). Our deferential review also applies to the trial court's conclusions regarding mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). We review de novo mixed questions of

7

law and fact that do not turn on credibility and demeanor, as well as purely legal questions. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

When, as here, the trial court makes explicit findings of fact, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports the findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We afford the prevailing party the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Lerma*, 543 S.W.3d at 190; *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).

## B. Detention and Arrest

In his first issue, Gomez contends that the trial court erred in denying his motion to suppress because his warrantless detention and arrest violated his constitutional rights. He asserts that the police officers detained him without reasonable suspicion and arrested him without probable cause.

### 1. Legal Principles

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. CONST. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). To suppress evidence because of an alleged Fourth

Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Id.* When a search or seizure has taken place without a warrant, the State bears the burden of establishing that the search or seizure was reasonable under the totality of the circumstances. *Id.* at 672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).

A law enforcement officer is justified in detaining a person for investigative purposes if the officer has a reasonable suspicion to believe the individual is violating the law. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists if an officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead the officer to conclude reasonably that a particular person actually is, has been, or soon will be engaged in criminal activity. *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007); *see Terry v. Ohio*, 392 U.S. 1, 30 (1968). A determination of reasonable suspicion is made by considering the totality of the circumstances, giving almost total deference to the trial court's determination of historical facts and reviewing de novo the trial court's application of the law to those facts not turning on an evaluation of credibility and demeanor. *Castro*, 227 S.W.3d at 741.

A police officer may make a warrantless arrest only if the officer has probable cause with respect to the person being arrested and has statutory authority to make the arrest. *See Neal v. State*, 256 S.W.3d 264, 280 (Tex. Crim. App. 2008). Applicable here, Code of Criminal Procedure article 14.01(b) permits a police officer to arrest an offender without a warrant for an offense committed in the officer's presence or view. *See* TEX. CODE CRIM. PROC. art. 14.01(b). An officer has probable cause when he has knowledge of facts that would lead a reasonable person to believe that the suspect has committed a crime or will soon do so. *Story*, 445 S.W.3d at 733. In determining whether probable cause exists we again apply a "totality of the circumstances" test. *Torres*, 182 S.W.3d at 902.

Probable cause deals with probabilities; it requires more than mere suspicion, but far less evidence than that needed to support a conviction or even than needed to support a finding by a preponderance of the evidence. *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997). "The rule of probable cause seeks to accommodate the sometimes-opposing interests of safeguarding citizens from rash and unreasonable police conduct and giving fair leeway to legitimate law enforcement efforts." *Id.*

### 2. *Analysis*

In its conclusions of law, the trial court determined that Officers Santuario and Valle had probable cause to arrest Gomez for the offense of deadly conduct

10

because Gomez displayed a firearm and pointed it in the direction of their vehicle. A person commits the offense of deadly conduct when he "recklessly engages in conduct that places another in imminent danger of serious bodily injury." TEX. PENAL CODE § 22.05(a). "Recklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded." *Id.* § 22.05(c). The trial court further concluded that the officers lawfully arrested Gomez because he committed the offense in their presence. *See* TEX. CODE CRIM. PROC. art. 14.01(b).

On appeal, Gomez contends that his behavior preceding his detention and arrest was not indicative of criminal activity. He points out that the incident occurred on September 7, 2017, when Houston was still recovering from Hurricane Harvey. Gomez avers that he had a constitutional right to protect his home with a firearm and that it is "wholly reasonable that [he] was concerned and alarmed by a strange truck driving by his house slowly at night." Gomez asserts that, "[w]hen contextualizing this situation, it is apparent that [he] was merely protecting his property from looters after Hurricane Harvey." However, we do not analyze reasonable suspicion or probable cause based on the subjective beliefs of the suspect or of the police officer; rather, we look to the totality of the circumstances to determine from the objective viewpoint of a reasonable officer whether, as in this case, a crime was committed. *See Ford*, 158 S.W.3d at 492; *see also Torres*, 182 S.W.3d at 901–02. In conducting

11

the analysis, we view the evidence in the light most favorable to the trial court's fact findings supporting its denial of the motion to suppress. *See Kelly*, 204 S.W.3d 818.

Among the trial court's findings of fact are the following:

FINDINGS OF FACT

4. Officer Santuario testified truthfully and credibly.

5. On September 7, 2017, Houston Police Department Officers M[.] Santuario and M[.] Valle were working in an undercover capacity while conducting surveillance of a target in an unrelated case in the area of the residence located [on Woodard Street in Houston.] (hereinafter referred to as "the house").

. . . .

7. At approximately midnight on September 7, 2017, Officer Santuario, who was driving an unmarked vehicle occupied by himself and Officer Valle, drove past the house. Officer Santuario observed [Gomez] sitting down on the brightly-lit porch of the house.

8. Officer Santuario pulled into the driveway of a residence adjacent to the house in order to turn his vehicle around. As he pulled his vehicle into the driveway, Officer Santuario observed [Gomez] stand up from the porch of the house and walk closer to the officers.

9. At that time, [Gomez] displayed a firearm in his right hand to the officers in a threatening manner. [Gomez] did not point the firearm directly at the officers, but he did point the firearm in the direction of the officers' vehicle.

(Record references omitted.)

The evidence admitted at the suppression hearing, when viewed in the light most favorable to the trial court's ruling, supports the above findings of fact. Officer Santaurio testified that he and Officer Valle were working undercover narcotics

surveillance in the vicinity of the home belonging to Gomez's mother. Officer Santaurio stated that, as they drove by the home, he saw Gomez sitting on the porch steps. Officer Santaurio testified that the porchlights were turned on and were "very bright." Officer Santaurio pulled the truck into the driveway of a neighboring home to turn around.

Officer Santaurio stated that he saw Gomez get up from the steps and walk closer toward the officers' truck. Officer Santaurio then saw Gomez "display[] a firearm in his right hand." Officer Santaurio testified that Gomez was not pointing the firearm directly at him and Officer Valle, but Gomez was pointing the firearm in the direction their truck in what he considered a threatening manner.

Officer Santaurio confirmed that, because the porch lights were bright, he could clearly see Gomez standing in the yard. During his testimony, Officer Santaurio demonstrated for the trial court how Gomez was standing while he was holding the firearm. As he demonstrated Gomez's stance, Officer Santaurio testified, "Initially he had his hand to the right with the pistol as he took two more steps. Then he bladed himself towards us, and he was lifting it in this matter [sic]." The prosecutor then asked, "For the record, you're holding your right arm up at a 45-degree angle, pointing it toward the ground, out from your body; is that correct?" Officer Santaurio responded, "Correct. But it's still in the direction of where our truck was at where we were."

13

Officer Santaurio's testimony, which the trial court found to be credible, supports the trial court's findings of fact stating that the officers saw Gomez (1) leave the porch where he was sitting, (2) walk towards them as they were in their truck in a neighboring driveway, and (3) point a firearm in their direction. These findings of fact, in turn, support (1) the trial court's implied conclusion that the officers had reasonable suspicion to detain Gomez and (2) its express conclusion that the officers had probable cause to believe that Gomez had committed the offense of deadly conduct in their presence, entitling them to arrest him. *See* PENAL CODE § 22.05(a), (c); *see also* TEX. CODE CRIM. PROC. art. 14.01(b). We hold the trial court did not err when it denied Gomez's motion to suppress evidence obtained as a result of his warrantless detention and arrest.[3]

We overrule Gomez's first issue.

## C.     Consent to Search

In his second issue, Gomez contends that the trial court erred in denying his motion to suppress the evidence, specifically the firearm, obtained as a result of the warrantless search of his mother's home. Gomez acknowledges that his mother gave

---

[3]     The trial court also concluded that the officers had probable cause to arrest Gomez for the offenses of aggravated assault and evading arrest and detention. However, because we conclude the record supports the trial court's conclusion that the officers had probable cause to arrest Gomez for the offense of deadly conduct, we need not discuss the trial court's conclusions regarding probable cause to arrest Gomez for the other two offenses.

her consent to Officer Santaurio to search the home for weapons, but he contends that her consent was not valid because he had a privacy interest in the home as a "co-occupant," and he expressly told the officers that he objected to the search.

### 1. Legal Principles

We presume that a warrantless police entry into a person's home is unreasonable unless the entry falls within an exception to the warrant requirement. *Valtierra*, 310 S.W.3d at 448 (citing *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007)). Voluntary consent is one such exception. *Id.* (citing *Johnson*, 226 S.W.3d at 443; *United States v. Matlock*, 415 U.S. 164, 165–66 (1974) ("[T]he search of property, without a warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment.")). Although consent must be positive, it may be given orally or by action, or shown by circumstantial evidence. *Id.* The validity of an alleged consent to search is a question of fact to be determined from the totality of the circumstances. *Id.* Under Texas law, the State must prove voluntary consent by clear and convincing evidence. *Id.*

### 2. Analysis

At the suppression hearing, Officer Santaurio testified that Gomez's mother consented to the officers searching her home for weapons and other persons. He

15

stated that Ms. Gomez told him that she was the owner of the home. She also told Officer Santaurio that her son did not rent from her. She indicated that her son was at her home that night because his daughter was staying there.

At the hearing, Ms. Gomez acknowledged that she told Officer Santaurio that her son did not live at her home. She testified, however, that was not true. Ms. Gomez said that her son lived with her at the time of the search and that he had been paying her rent. She testified that she told Officer Santaurio that her son did not live there because she had felt "afraid," "pressured," and "intimidated."

Gomez also testified that he lived at his mother's home at the time of the search. He claimed that he had been paying utility bills for the home and had been paying rent to his mother. Gomez and his mother testified that Gomez indicated to the officers that they could not search the home. In addition, video from the body cameras shows that Gomez objected to the officers entering the home without a search warrant.

Based on foregoing evidence, the trial court made the following findings of fact and credibility assessments:

4. Officer Santuario testified truthfully and credibly.

. . . .

17. Ms. Gomez told Officer Santuario that the house was her residence and that she was the owner of the house.

18. Ms. Gomez was the owner of the house on the date of the search.

16

19. Ms. Gomez told Officer Santuario that [her son] did not live at her house. Ms. Gomez's testimony that she told the officers that [her son] did not live at the house because she felt afraid, pressured, and intimated is not credible.

20. Ms. Gomez told Officer Santuario that [her son] was staying at her house because his daughter was staying there and that [her son] was not renting from her. Ms. Gomez's testimony that [her son] was paying rent to her at the time of the search is not credible. Likewise, [Gomez's] testimony that he was paying rent to [his mother] and paying the utility bills for the house at the time of the search is not credible.

21. Based on the information that the officers obtained from Ms. Gomez and [her son] at the time of the search, [Gomez] did not have equal control over the house.

22. Officer Santuario obtained Ms. Gomez's consent to search the house for additional people or weapons.

(Record references omitted.) The trial court also made fact findings regarding the statements made by Gomez after the patrol officers arrived, indicating that he objected to the officers entering and searching the home without a warrant. Based on the findings, the trial court concluded that the warrantless search of the home was justified based on the circumstances and Ms. Gomez's consent.

On appeal, Gomez asserts that the search was unlawful because he "had a legitimate expectation of privacy in his childhood home—one that he has lived in for his entire life." In making this assertion, Gomez does not, however, recognize that the trial court found, based on the evidence and its credibility determinations, that Gomez did not reside at the home at the time of the search.

17

Although it found that Gomez did not live at the home, the trial court did conclude that, "[b]ased on the information relayed to the officers by Ms. Gomez and [Gomez] at the time of the search, the officers, including Officer Santuario, reasonably believed that [Gomez] was merely an overnight or short-term guest at the house." The trial court further concluded that, "[a]s at least an overnight guest, [Gomez] ha[d] standing to contest the legality of the search of the house."

"The Texas Court of Criminal Appeals has held that '[a]n overnight guest has a legitimate expectation of privacy in his host's home,' and thus has standing to complain that he has suffered a Fourth Amendment violation." *Rodriguez v. State*, 313 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Luna v. State*, 268 S.W.3d 594, 603 (Tex. Crim. App. 2008); *Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002) (in turn citing *Minnesota v. Olson*, 495 U.S. 91, 98 (1990)). "However, even if a party has standing under the Fourth Amendment as an overnight guest, his Fourth Amendment claim may fail on its merits." *Id.* (citing *Luna*, 268 S.W.3d at 603). "In particular, 'a third party may properly consent to a search when she has control over and authority to use the premises being searched.'" *Id.* (citing *Luna*, 268 S.W.3d at 604 (holding that trial court did not err in denying motion to suppress evidence obtained as result of warrantless search of apartment because third party with control and authority of apartment had validly consented to search and had denied appellant lived with her; third party explained that appellant

stayed with her at apartment only "on and off," and appellant also indicated that he lived elsewhere).

Assuming the trial court correctly concluded that Gomez had standing to contest the legality of the search of the house as an overnight guest, we nevertheless conclude, as did the trial court, that "any expectation of privacy [Gomez] had in his mother's house was overridden by his mother's valid consent to the police to enter." *Id.* at 407–08 (citing *Luna*, 268 S.W.3d at 604 (holding that, because search of apartment was supported by owner's valid consent, trial court did not err in denying appellant overnight guest's motion to suppress evidence obtained as result of warrantless search)). Here, the evidence supported the trial court's conclusion that, "[a]t the time of the search, the officers reasonably believed that [Gomez] did not have control over the house, particularly the living room where the gun was found, equal to or greater than that of Ms. Gomez." *See Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011) ("Apparent authority is judged under an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" (internal quotations omitted)).

Gomez cites *Georgia v. Randolph* to support his assertion that, as a "co-occupant" of the house, he had the authority to object to the search (which he did numerous times) and demand that the police not enter the home, even after his

mother, the homeowner, consented to the entry and search. 547 U.S. 103, 108–09 (2006). He asserts that, because he had authority to object to the search as a "co-occupant," the search was unreasonable under *Randolph*.

In *Randolph*, the United States Supreme Court addressed whether evidence can be lawfully admitted when the evidence is seized despite an objection from a person who is physically present for the search and who shares equal authority with the person who authorized the search. *Id.* at 106. Here, the trial court found, based on the evidence, that Gomez did not live at his mother's house. Gomez, unlike the defendant in *Randolph*, did not have equal control over the home. *See Rodriguez*, 313 S.W.3d at 408 (distinguishing status of appellant in that case, who was overnight guest, from defendant in *Randolph* because overnight guest does not share equal authority over property with property owner); *see also Luna*, 268 S.W.3d at 604 n.26 (making similar distinction between property-owning resident and overnight guest). Gomez lacked authority to prevent the police from entering the house after his mother, who owned the property and lived there, validly consented to their entry; therefore, *Randolph* does not apply. *See Rodriguez*, 313 S.W.3d at 408.

We conclude that, under the circumstances, the warrantless search of Ms. Gomez's home was reasonable and lawful.[4] *See id.* We further hold that the trial

---

[4] The trial court also concluded that the search was lawful based on exigent circumstances; however, given our holding regarding Ms. Gomez's consent to

court did not err when it denied Gomez's motion to suppress evidence obtained as a result of the warrantless search of his mother's home.

We overrule Gomez's second issue.

**Conclusion**

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Keyes, Lloyd, and Hightower.

Publish.  TEX. R. APP. P. 47.2(b).

---

search, we need not discuss exigent circumstances as an alternative basis on which the trial court denied the motion to suppress.