In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-05-025 CR


____________________



MILLET HARRISON, JR., Appellant



V.



STATE OF TEXAS, Appellee






On Appeal from the 252nd District Court


Jefferson County, Texas


Trial Cause No. 66306






OPINION



 This is an appeal of a court order compelling continued inpatient mental health
treatment under article 46.03 of the Code of Criminal Procedure. See Tex. Code Crim.
Proc. Ann. art. 46.03. (1) In Millet Harrison's last appeal, this Court held the record of the last
hearing did not support the trial court's finding of the inappropriateness of outpatient
treatment. See Harrison v. State, 148 S.W.3d 678, 689 (Tex. App.--Beaumont 2004, no pet.). 
On remand, the trial court held a new hearing and admitted testimony from a court-appointed
expert, who concluded continued inpatient mental health treatment was required. In this
appeal, Harrison argues the trial court could not consider this evidence, and if the evidence
is ignored the record contains insufficient evidence to support the trial court's order. We
conclude the trial court did not err in considering the evidence. We therefore affirm the trial
court's order. 

 In October 1994 a jury found Millet Harrison not guilty by reason of insanity for the
murder of his mother. Harrison, 148 S.W.3d at 679, 685. He was ordered transferred to a
state hospital for inpatient treatment. Id. at 679. In the ensuing years, the trial court granted
the State's applications for renewal of extended court-ordered inpatient mental health
services. See Harrison v. State, No. 09-98-134 CR, 1999 WL 160825, at *1 (Tex. App.--Beaumont Mar. 24, 1999, no pet.) (not designated for publication). Harrison has previously
appealed from the trial court's inpatient commitment orders of February 1998, May 1999,
and December 2003. Id; see also Harrison, 148 S.W.3d at 679; Harrison v. State, No. 07-99-0259-CR, 1999 WL 994378, at *1 (Tex. App.--Amarillo Nov. 2, 1999, no pet.) (not
designated for publication). 

 In the 2003 commitment hearing, two expert witnesses testified that outpatient, rather
than inpatient, treatment was appropriate for Harrison. See Harrison, 148 S.W.3d at 688. 
However, the trial court found the proposed outpatient services were not appropriate and
ordered extended inpatient mental health services. Harrison, 148 S.W.3d at 679, 689. 
Harrison appealed the December 2003 order and this Court reversed and remanded the case
to the trial court. Id. at 689. In the 2004 opinion, this Court concluded on that record as
follows:

 [T]he trial court's [December 2003] finding that out-patient supervision is not
appropriate is not supported by the record. Therefore, we reverse the judgment
of the trial court and remand for further proceedings consistent with this
opinion.


Id. at 689 (footnote omitted). 

 On remand, in an effort to follow this Court's opinion, the trial judge appointed Dr.
Dan Roberts, a psychologist, to assist him in formulating an appropriate regimen of
treatment. The trial court's order stated in part as follows: 

 In an Opinion delivered on October 27, 2004, the Ninth District Court of
Appeals concluded that the trial court's finding that out-patient supervision
was not appropriate [was] not supported by the record, and thus reversed this
court's judgment and remanded for further proceedings consistent with their
Opinion. Pursuant to Article 46.03, section 4(d)(4) [as referenced by the
appellate court in [its opinion]], it is within the trial court's discretion to
determine the appropriate regimen of medical, psychiatric, or psychological
care or treatment, which could include psychoactive medications. This court
has appointed Dan Roberts, Ph.D . . . to conduct an evaluation of Millet
Harrison for this purpose. 


Based on his interview with Harrison and a review of Harrison's medical and trial records,
however, Dr. Roberts reported, and then testified in the 2005 hearing, that he cannot
recommend an appropriate outpatient treatment plan, and that continued inpatient treatment
is required. In contrast, Dr. Self and Dr. Gripon, experts called by Harrison, again
recommended outpatient treatment with the use of injectable antipsychotic medication. 
Based on Dr. Roberts' report and his testimony at the hearing, the trial court ordered Harrison
to remain an inpatient at Rusk State Hospital. 

 Harrison raises four issues on appeal. In issues one and two, he argues Dr. Roberts'
report and testimony were not admissible and trial counsel was ineffective in failing to object
to their admission. We look to Strickland v. Washington for the "ineffective assistance of
counsel" standard. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d
674 (1984). (2) To establish ineffective assistance, appellant must show by a preponderance
of the evidence that his counsel's representation fell below the standard of prevailing
professional norms, and that there is a reasonable probability that, but for counsel's
deficiency, the result of the trial would have been different. Strickland, 466 U.S. at 687; see
also Salinas v. State, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005)(citing Strickland, 466
U.S. 668). Appellate review of counsel's representation is highly deferential, and a
reviewing court indulges a strong presumption that counsel's conduct fell within reasonable
representation. Salinas, 163 S.W.3d at 740 (citing Mallett v. State, 65 S.W.3d 59, 63 (Tex.
Crim. App. 2001)). 

 Prior to Dr. Roberts' testimony, Harrison's trial counsel objected that, in view of this
Court's prior opinion, the trial court should not consider evidence concerning inpatient
treatment, and that the evidence at the hearing should "only deal with outpatient treatment." 
The trial judge overruled Harrison's objection. When Dr. Roberts testified he did not believe
outpatient treatment was appropriate, trial counsel did not reassert the objection. We do not
believe on this record that further objection was necessary to inform the trial court of
Harrison's position, nor do we see the failure to repeat the objection under the circumstances
as inadequate assistance of counsel. 

 Harrison contends the purpose of the 2005 hearing was to determine a proper regimen
for outpatient services. He asserts the trial court, in accepting Dr. Roberts' report and
conclusions, exceeded the proper scope of the hearing. Harrison further argues Dr. Roberts'
report and testimony represented a new opinion (but not new evidence) that the trial court
used as a basis for making what Harrison characterizes as "the very same ruling that was
reversed by this Appellate Court." In brief, he maintains Dr. Roberts' opinion was irrelevant
and in conflict with this Court's 2004 holding. 

 However, this Court did not order Harrison's release from the trial court's supervision,
nor did this Court say the trial court could not consider additional evidence in the future
while Harrison remained under court-ordered treatment and supervision. See Harrison, 148
S.W.3d at 689. To the contrary, as the trial court correctly noted, this Court stated, "[I]t is
within the trial court's discretion to determine the appropriate regimen of medical,
psychiatric, or psychological care or treatment, which could include psychoactive
medications." Harrison, 148 S.W.3d at 689 n.7. If the record at the hearing had remained
the same -- that is, if no additional evidence that inpatient treatment was required had been
presented to the trial court -- an outpatient treatment regimen would have been appropriate,
given this Court's prior decision; but that is not what occurred at the 2005 hearing in this
case. The trial court below was presented with additional evidence from a court-appointed
expert who testified inpatient treatment was required. His report and testimony included
information not presented to the trial court at the 2003 hearing. The trial court found his
testimony credible. The weight to be given the evidence is within the factfinder's discretion. 
See City of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex. 2005) (Factfinder is sole judge of
the credibility of the witnesses and weight to be given their testimony.). As the court of
continuing jurisdiction, the trial court could consider Dr. Roberts' report and testimony,
including the evidence not previously presented in prior expert testimony. See Tex. Code
Crim. Proc. Ann. art. 46.03, § 4(d)(1),(4),(5). We hold the trial judge acted within his
discretion in admitting and considering the court-appointed expert's report and testimony. 

 Harrison also asserts his trial counsel was ineffective in failing to object when Dr.
Roberts testified Harrison had previously been an outpatient before killing his mother, and
had often refused his medication. Harrison says there is no evidence to support this
statement. The record indicates Harrison had been under psychiatric care outside the hospital
setting, and there is evidence he had, on occasion, refused his medication. Whether those
refusals can be characterized as "often" goes to the weight of the evidence, not its
admissibility. See Hess v. McLean Feedyard, Inc., 59 S.W.3d 679, 686 (Tex. App.--Amarillo
2000, pet. denied). 

 Harrison maintains his counsel was ineffective because he did not object to the order
of presentation of witnesses at the hearing, and he argues the order of proceedings shifted the
burden of proof at trial. We set out the exchange between the Court and State as follows:

 [State:] So, my understanding is [the Court] want[s] [t]he State to go ahead
and go first, which is fine. What we'd like to do is we would like to ask the
Court, first of all, just for purposes of the record, to take judicial notice of the
report that was provided by Dr. Dan Roberts to the Court.


 [The Court:] I'll do that, and I'm going to mark that as Court's Exhibit No.
1.


 [State:] And what [t]he State would like to do at this point in time is we have
no further matters to bring before the Court at this point; but we do reserve the
right to call Dr. Roberts in rebuttal to what [defense counsel] may present, if
that's okay with the Court. 


The party with the burden of proof normally opens and closes the presentation of evidence. 
Nobles v. Employees Ret. Sys. of Texas, 53 S.W.3d 483, 490 (Tex. App.--Austin 2001, no
pet.). The State presented its case first by submitting Dr. Roberts' extensive report to the trial
court. Harrison then presented his case with expert witnesses and one family witness. The
State followed with the rebuttal testimony of Dr. Roberts, and Harrison then recalled his two
experts to respond to Dr. Roberts' testimony. The order of the proceedings did not place the
burden of proof on Harrison. We overrule issues one and two. 

 In issue three, Harrison contends his trial counsel was ineffective because he did not
object to the failure to follow the procedure of Tex. Health & Safety Code Ann. §
574.009 (Vernon 2003) regarding certificates of medical examination. The trial court's
hearing was governed by article 46.03. See Tex. Code Crim. Proc. Ann. art. 46.03, §
4(d),(5). In Campbell v. State, the Texas Supreme Court held that a trial court may conduct
a hearing under article 46.03, section 4(d)(5), without the medical certificates required by the
Mental Health Code. See Campbell v. State, 85 S.W. 3d 176, 183 (Tex. 2002); see Tex.
Health & Safety Code Ann. § 574.001 (Vernon Supp. 2005); Tex. Health & Safety
Code Ann. §§ 574.009, 574.011 (Vernon 2003). The medical certificate requirements of
sections 574.009 and 574.011 apply to proceedings for court-ordered mental health services
initiated under section 574.001 of the Mental Health Code. Campbell, 85 S.W.3d at 183. 
The Supreme Court explained section 574.001 proceedings involve different concerns and
"apply to a different class of individuals than do article 46.03 section 4(d)(5) proceedings[,]"
which apply "only to those persons acquitted of a violent crime by reason of insanity who
have been previously committed to a state mental hospital or other appropriate facility." 
Campbell, 85 S.W.3d at 183. The article 46.03, section 4(d)(5) proceedings are brought to
determine whether insanity acquittees should be released from commitment. Campbell, 85
S.W.3d at 183. In contrast, section 574.001 of the Mental Health Code applies to persons
who have not had the added protections that accompany a proceeding which results in an
acquittal because of insanity. Campbell, 85 S.W.3d at 183. Because the section 574.009
medical certificates were not a prerequisite for the hearing, trial counsel was not ineffective
in failing to object. Issue three is overruled.

 In issue four, Harrison challenges the legal and factual sufficiency of the evidence to
support the trial court's implicit finding of the inappropriateness of outpatient treatment. 
Again, he argues Dr. Roberts' testimony should be disregarded. Because Dr. Roberts' expert
opinions and reported facts were admissible, however, we consider them in the sufficiency
review. (3)

 In a legal sufficiency review where the burden of proof is clear and convincing
evidence, the reviewing court must consider all the evidence in the light most favorable to
the finding to determine whether a reasonable trier of fact could have formed a firm belief
or conviction that its finding was true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). The
reviewing court assumes the factfinder resolved disputed facts in favor of its finding if a
reasonable factfinder could do so. Id. at 266. 

 In a factual sufficiency review, the reviewing court considers all the evidence, both
in support of and contrary to the trial court's findings. In re C.H., 89 S.W. 3d 17, 27-29
(Tex. 2002). The court gives due consideration to evidence that the factfinder could
reasonably have found to be clear and convincing. Id. at 25. The appellate court must
determine whether the evidence is such that a factfinder could reasonably form a firm belief
or conviction about the truth of the State's allegations. Id. We consider whether disputed
evidence is such that a reasonable trier of fact could not have reconciled that disputed
evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. The appellate court retains
deference for the role of the factfinder. In re C.H., 89 S.W.3d at 26. 



 The testimony presented by the witnesses at the 2005 hearing was in conflict, and the
trial judge as factfinder was required to determine which testimony to accept as credible. See
City of Keller, 168 S.W.3d at 819. Dr. Self, Harrison's psychiatrist for the past two and one-half years, testified Harrison is in complete remission; he says there have been no problems
of noncompliance or behavior indicating a relapse or return of Harrison's paranoid
schizophrenic condition. Dr. Self testified: "[W]hen [Harrison is] in the mental state he's
been in for the last two and a half years, I have no doubt about his insight into the presence
of mental illness and the need for medication." Dr. Self indicated Harrison has refused to
take his "essential" medication, the psychotropic medicine, on only one occasion in the last
two and one-half years. During the medication change in early 2004, he declined to take one
pill of Risperdal because of pronounced side-effects. Dr. Self testified he addressed the issue
and removed the oral Risperdal from Harrison's medications; Harrison was already receiving
the injectable psychotropic drug. Based on his experience with Harrison, Dr. Self concluded
Harrison does not have a pattern or history of refusing the psychotropic medication. Dr. Self
explained, "[T]he only thing that elevates [Harrison's] risk of future dangerousness is his
mental illness, and his mental illness is controllable with medication. . . . [T]he relapse with
this kind of illness doesn't happen in minutes or hours . . . . [I]f he's still on his medication
and he elopes, it's very unlikely that he's symptomatic[.]" However, Dr. Self also stated, "If
he has relapsed his illness, he is at high risk of aggression[.]" 

 Dr. Self recommended the following outpatient treatment plan: use of injectable, long-acting, psychotropic medications; psychiatric care; regular contract with MHMR personnel;
residing with family; and the resumption of Harrison's career. Returning Harrison to
inpatient treatment, Dr. Self indicated, would amount to "warehousing." 

 Dr. Gripon has evaluated Harrison periodically over the last ten or eleven years. Until
the late 1990s, Gripon recommended continued inpatient treatment; now he recommends
outpatient treatment. Like Dr. Self, Dr. Gripon testified that Harrison, while on medication,
shows no current symptoms associated with schizophrenia. Dr. Gripon testified as follows: 

 I found a man who, although a paranoid schizophrenic by history, his
condition is adequately treated. He is stable, and he continues to remain
stable. He appeared much as he had the last couple of years in which I've
evaluated him.

 . . . .

 Actually if you evaluate Millet Harrison from a psychiatric standpoint, you can
make a diagnosis of schizophrenia in him only by history. He shows no
current symptoms associated with schizophrenia. . . . So, his condition is in
remission. There's no evidence of it now.


Dr. Gripon concludes Harrison's condition is a "lifelong malady. It's treatable. It's not
curable. It's never going away completely." Like Dr. Self, Dr. Gripon characterizes
inpatient treatment at this stage as "warehousing" and does not "think the hospital has
anything to offer [Harrison] any longer." Gripon indicated his willingness to be part of an
outpatient plan and to administer Harrison's medication on a regular basis. He agreed the
outpatient treatment plan should include court-ordered injectable psychoactive medications
and emphasized the importance of family involvement. Dr. Gripon explained that outpatient
treatment must be under court-ordered supervision because he says "there are no guarantees."
He testified, "There [are] certain probabilities, though. What you need is a plan that has the
potential for being effective, and then you have to have some consequence or some kind of
alerting of individuals if that were not the case." Dr. Gripon indicated that any relapse and
resumption of Harrison's illness would be gradual, and he believes "our system could find
[Harrison] in that period of time." However, Dr. Gripon agreed the only guarantee is "a
forced environment." 

 Diane Randle, Harrison's niece, testified Harrison would reside with her. She
indicated she would report to the authorities if Harrison "is an hour gone missing," but she
also acknowledged there would be periods during the day she would not be around to
supervise him. She said other family members could be available to stay with Harrison
during those hours. 

 Dr. Roberts, a clinical psychologist, does not agree with the assessments of Dr. Gripon
and Dr. Self. Dr. Roberts' report and testimony evidence a continuing pattern of Harrison's
behavior that confirms the likelihood Harrison will cause serious harm to others. Dr. Roberts
testified Harrison has distorted his record to appear less dangerous in hopes of effecting an
eventual release from inpatient treatment at the state hospital. The behavior, as described by
Dr. Roberts, involves Harrison's consistent misrepresentation of his medical history to
others, his history of failure to take medication when being treated outside a hospital setting,
and his manipulation of mental health staff. 

 Dr. Roberts described the notes of a Vernon State Hospital psychologist who indicated
Harrison was "dissembling" and not providing accurate information about his own history.
Roberts explained that Harrison represented to mental health staff members, as well as to the
court in earlier testimony, that he had gone nineteen years without any problems after the
1975 mental illness diagnosis, and that it was only after a doctor took him off medication that
he suffered a relapse and killed his mother. Dr. Roberts testified Harrison's representations
are not true. Rather than a nineteen year period without mental illness, Dr. Roberts' review
of the records revealed Harrison was in a mental hospital five times after his first
hospitalization with the paranoid schizophrenic illness in 1975. One hospitalization was 
precipitated by Harrison's choking his mother as she lay in her bed. Another relative in the
house pulled Harrison off his mother, called the police, and took him to the hospital. Another
time Harrison argued with his sister and choked her. Police took him to the hospital. Dr. Roberts reported that after Harrison killed his mother and, while he was a patient
at Vernon State Hospital, Harrison threatened to cut off a staff member's head, physically
attacked a staff member, and threatened to kill other staff members. Dr. Roberts also noted
the records indicate Harrison has been upset on "several occasions" -- yelling and cursing at
employees and on one occasion banging on the door; yet Harrison has consistently
represented himself as being compliant without problems. 

 According to Dr. Roberts, Harrison has over the years given misleading responses. 
One example cited by Dr. Roberts is Harrison's comment in the mid-1990's to a hospital staff
member that although he would have to admit he had the condition of schizophrenia, he
needed to stop talking as if he had an active case; he said he would do whatever it took to get
out of the hospital. Roberts says a year or so after that medical record notation, the records
reflect the psychologist felt Harrison was providing false information about his background
and was attempting to pass the dangerousness review with the hospital.

 Citing another example of Harrison's history of misleading responses, Roberts
indicated Harrison has testified he had "maintained very well" on his medicine before the
killing. However, as Roberts explained, "[O]n several occasions at least, the records indicate
from the Beaumont Neurological Hospital that his family members have been encouraging
him to take his medicine and were upset that he was not taking his medicine and they
couldn't make him." Roberts explained that as long as Harrison remains an inpatient, as he
has since the killing, compliance is not an issue, because he is monitored and required to take
his medicine. However, Roberts pointed out that Harrison's history indicates that when he
is not in a facility, he does not always comply with medication requirements. Dr. Roberts
explained, "[I]t's very common for people with paranoid schizophrenia to stop taking their
medicine." Dr. Roberts also stated, "The last time he was an outpatient Mr. Harrison
demonstrated a pattern of not always taking his medicine as prescribed. He has avoided it,
refused it, or forgotten to take his medicine as prescribed on a number of occasions when he
has been treated as an outpatient." Based on the records, Roberts concluded the compliance-with-medication claim is misleading and distorted. He testified Harrison is "going to be
dangerous to people who are close to him." (4)
 

 Dr. Roberts noted certain recent paranoid tendencies that he believes show Harrison
is not in remission. In his report, Roberts commented as follows on his review of early 2004
medical records: 

 On January 29, 2004 Dr. Self again noted that he believed that the patient
could be counted on to come forward with the emergence of any new
symptoms. A multi-disciplinary case conference note on February 20, 2004
indicated that his [Harrison's] continued residence at state hospital had been
causing depression. Soon after that other records reflect that he began to
exhibit some paranoia. There are no indications in the notes that he came to
his physician or any other staff member to report these symptoms or to discuss
their implications. (emphasis in Dr. Roberts' report). 


Roberts again noted paranoid tendencies when he interviewed Harrison in December 2004,
prior to the January 2005 hearing. Harrison described how certain events in his life "pointed
to a conspiracy, that the government had it in for him and people like him and his family." 
When Roberts asked Harrison about hospital staff comments in 2001 that described paranoid
comments, Harrison acknowledged he had made the comments, but he minimized their
significance. In early 2004 Harrison's medication was changed from Prolixin Decanoate to
Risperdal Consta, a second generation antipsychotic. During that time, Dr. Self "observed
him to be unusually kind of talkative, rambling, what I characterized as paranoid, but by that,
I did not imply delusional but just suspicious statements one time that I saw him, on the 8th
of March." Although Dr. Self acknowledged Harrison's conduct could suggest Harrison was
still suffering from paranoid schizophrenia symptoms, Dr. Self ultimately attributed the
"change in [Harrison's] mental state" to the change in medication. Dr. Self has concluded
Harrison is in "full remission." However, Dr. Roberts believes Harrison is not in remission. 

In addition to his concerns about Harrison's continued paranoid tendencies and history of
noncompliance-with-medication in outpatient treatment, Dr. Roberts also expressed concern
about Harrison's dangerousness: "[H]is aggressive behavior over the years, the fact that his
aggression is largely dependent on his delusional beliefs, the fact that he still seems to be
delusional, the fact that evidence has indicated in the past he becomes delusional fairly
quickly when he gets off his medicine" and "the fact that he remains paranoid
schizophrenic[.]" 

 Dr. Roberts testified that if Harrison is not continued in inpatient treatment, he will
in all likelihood experience a deterioration, and that will result in a serious or considerable
risk to members of the public. Dr. Roberts testified Harrison would likely become dangerous
outside the hospital setting and is likely to cause serious harm to others. As the factfinder
in this case, the trial court is the judge of the credibility of the witnesses and the weight to
be given their testimony. See City of Keller, 168 S.W.3d at 819. The trial court found
Harrison is mentally ill and as a result of his mental illness is likely to cause serious harm to
others. No one disputes that Harrison suffers from "chronic paranoid schizophrenia," and
he killed and mutilated his mother under the influence of that mental illness. The record
reflects there is currently no cure for his illness, and without antipsychotic medication he is
likely to cause serious harm to others. We conclude there is clear and convincing evidence
in the record of the 2005 hearing from which the trial court reasonably could have formed
a firm conviction that Harrison continues to meet the inpatient criteria for involuntary
commitment. Considering the clear and convincing evidence presented on rehearing, the trial
court did not err in ordering continued inpatient treatment. See Tex. Code Crim. Proc.
Ann. art. 46.03, § 4(d); see also Tex. Health & Safety Code Ann. § 574.035 (e)(1)
(Vernon Supp. 2005); see In re J.F.C., 96 S.W.3d at 266. 

 We overrule issue four. The trial court's judgment is affirmed.

 AFFIRMED.


 _________________________________

 DAVID GAULTNEY

 Justice


Submitted on September 12, 2005

Opinion Delivered November 30, 2005

Publish


Before McKeithen, C.J., Gaultney, and Horton JJ.
1. See Act of May 18, 1977, 65th Leg., R.S., ch. 596, § 2, 1977 Tex. Gen. Laws 1458,
1467-69 (amended 1983, 1989, 2001, 2003). The Texas Legislature repealed article 46.03
in 2005 and amended the Code of Criminal Procedure to add "Chapter 46C. Insanity
Defense." The 2005 amendment says that it applies "only to an offense committed on or
after the effective date of this Act. An offense committed before the effective date of this
Act is covered by the law in effect when the offense was committed, and the former law is
continued in effect for that purpose." Act of May 27, 2005, 79th Leg., R.S., ch. 831, §§ 1,
2,5, 2005 Tex. Gen. Laws 2841, 2853-54. 
2. Although involuntary commitment is a civil rather than a criminal matter, the
criminal standard for ineffective assistance of counsel applies. See In re Protection of
H.W., 85 S.W.3d 348, 355-56 (Tex. App.--Tyler 2002, no pet.). 
3. We review the trial court's findings under legal and factual sufficiency standards. 
See Campbell v. State, 125 S.W.3d 1, 4-5 (Tex. App.--Houston [14th Dist.] 2002, no
pet.)(clear and convincing evidence); Tex. Health & Safety Code Ann. § 574.035(a)
(Vernon 2003)("clear and convincing evidence"). The parties have not briefed any other
standard of review. Other than as we have done in issues one and two, we do not consider
it necessary in this case to address whether a different standard of review may apply to
discretionary decisions by the committing court. See Tex. Code Crim. Proc. Ann. art. 46.03
§ 4(d)(4),(5).
4. Based on his review of the records, Roberts described the weeks leading up to the
killing of Harrison's mother as follows: 

 He stopped taking his medicine, he's forgotten to take it and he's refused to
take it on a number of occasions. When he was hospitalized in 1993,
December, a month before his mother was killed, he had seen Dr.
Hunsucker in Houston who had agreed, not recommended but had agreed for
a trial of no medicine. So, he stopped taking it. He was placed in the
hospital. He agreed in his hearing at the hospital to follow whatever
treatment recommendations Dr. Bailey made for him. Dr. P.W. Bailey was
his attending physician there. He agreed to take his medicine. They sent
him home. He didn't take his medicine. He did go back to Houston to see
Dr. Hunsucker again on January 6, 1994. Dr. Hunsucker asked him to take
his Loxitane and to come in in a week or so for another meeting and to bring
his family. He did return about two weeks later for another meeting -- well,
he declined to take the Loxitane. He didn't want to take it then; so, he
didn't.

 He came back in two weeks on the 19th, I believe, without the family
members. He told the doctor that they had settled everything and that
everything was cool with the family. Dr. Hunsucker again mentioned the
Loxitane; and he said, no, he didn't want to take it, that he was doing fine
without it. I think he did agree to take some Cogentin for a little while, but
that's not an antipsychotic medicine. Less than two weeks after that, the
murder occurred.