**Opinion issued December 12, 2023**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-22-00502-CR

—————————————

**KEITH DAMON SNELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 66th District Court**
**Hill County, Texas**
**Trial Court Case No. F137-22[1]**

---

[1] The Supreme Court of Texas transferred this appeal from the Court of Appeals for the Tenth District of Texas. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases). Under the Texas Rules of Appellate Procedure, "the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court." TEX. R. APP. P. 41.3. The parties have not cited, nor has our own research revealed, any conflict between the precedent of the Tenth Court of Appeals and that of this Court on any relevant issue.

## MEMORANDUM OPINION

A jury found appellant Keith Damon Snell guilty of the second-degree felony offense of possession with intent to deliver at least one gram but less than four grams of methamphetamine. *See* TEX. HEALTH & SAFETY CODE §§ 481.102(6), 481.112(c). After finding two felony enhancement paragraphs to be true, the trial court sentenced Snell to 60 years in prison. *See* TEX. PENAL CODE § 12.42(d). In two appellate issues, Snell challenges the trial court's denial of his motion to suppress.

We affirm.

### Background

A grand jury indicted Snell for "intentionally or knowingly possess[ing], with intent to deliver, a controlled substance, namely methamphetamine, in an amount of one gram or more but less than four grams, including any adulterants or dilutants." The indictment also alleged two prior and sequential felony convictions.

Snell filed a pre-trial motion seeking to suppress, inter alia, evidence "seized without warrant." Two witnesses testified at the hearing on Snell's motion: (1) J. Patrick, Chief of the City of Hubbard Police Department and (2) Charidy Craven, Snell's girlfriend.

Chief Patrick testified that, in the early morning of May 27, 2020, Craven called Sergeant T. Monthey of the City of Hubbard Police Department stating that she "was in fear" of Snell and "wanted [him] removed out of the house." Craven told

police that Snell had active felony warrants and had illegal drugs. The police contacted the sheriff's office and confirmed that Snell had two outstanding felony warrants. Chief Patrick also asked for additional law enforcement officers to aid in Snell's arrest that morning. Chief Patrick and Sergeant Monthey were joined by Constable L. Armstrong and two sheriff's deputies. They went to Craven's residence on Northeast 5th Street. Chief Patrick testified that, while the officers were en route, Sergeant Monthey received another phone call from Craven in which she stated that Snell was at the residence.

Chief Patrick acknowledged that, before going to Craven's home, he did not obtain a search warrant. He said that, when he and the other officers arrived at the residence, they surrounded it. They "knocked several times, front, sides, back" and heard movement inside the house. Chief Patrick testified that, "due to Mr. Snell having active felony warrants, [they] proceeded into the house," which was unlocked. The officers went through the kitchen to the bedroom where they saw Craven and Snell. Chief Patrick said Snell was on the bed pretending to be asleep.

Chief Patrick arrested Snell, walked him out of the residence, and placed him in a patrol car where he advised Snell "of his rights." Chief Patrick stated he then spoke with Craven, and she signed a consent form to search the home. The State offered the consent-to-search form into evidence. The form reflected that Craven had signed the form at 10:30 a.m.

3

According to Chief Patrick, after Craven signed the consent form, he and Craven entered the home. There, Craven pointed to a box in the bedroom and stated that the box contained narcotics. Inside the box "were several baggies, plastic-wrapped baggies with a clear rocky substance," which Chief Patrick "believed to be methamphetamine," along with a scale. The box also contained "five small bags of green leafy substance that [he] believed to be marijuana and $894.00 in cash." Photographs of the box's contents were admitted into evidence.

The substance that Chief Patrick suspected was methamphetamine was sent to the Department of Public Safety (DPS) laboratory. The DPS lab report, also admitted into evidence, showed that 1.3 grams of methamphetamine was in the box.

Craven testified that, at the time of Snell's arrest, she lived at the residence with her three children, ages 17, 12, and 6. On direct examination, Craven stated that Snell also lived there but, on cross-examination, she said that Snell would visit "[e]very so often" because he was the father of her youngest child. Craven stated that her children were not at home when the police arrested Snell and searched their house. Earlier that morning, Craven's 17-year-old son had gone to school and Craven's aunt had picked up her two daughters.

Craven testified that the police arrested Snell between 10:30 a.m. and 11:00 a.m. She acknowledged that earlier that morning, around 2:00 a.m., she had stopped at the police station on her way home from work to speak with Sergeant Monthey

4

about Snell. Craven testified that her aunt had arranged the meeting. She explained that her aunt had informed her that the police planned to arrest Snell on the outstanding warrants. Craven's aunt indicated that the police had information "that could get [Craven's] kids taken away from [her]." Craven testified that her aunt expressed concern that, when the police came to arrest Snell, they would find "dope" in the house along with Craven's children. Craven explained that her aunt had convinced her to talk to Sergeant Monthey because she needed "to do the right thing." Craven confirmed that she "did not approve of" Snell keeping illegal drugs in the house because she had young children, and she did not approve of his drug use because it caused him to not "make the best" decisions.

Craven testified that, when she met with Sergeant Monthey, she did not verbally consent to her home being searched. She confirmed that her "children [were] mentioned" and that she was "encouraged to cooperate with the police." When asked, she agreed that she felt that she had no choice but to cooperate.

According to Craven, when the police arrived at her home, she and Snell had been asleep for about two hours. Craven denied that she had called Sergeant Monthey to confirm that Snell was in the house.

Craven testified that, when Snell was arrested, she followed him out of the house but stayed on the porch where she spoke with Chief Patrick and Sergeant Monthey. Chief Patrick had testified that Craven gave her verbal consent to search

5

the residence, but Craven denied giving her verbal consent while she and Chief Patrick spoke on the porch. Instead, Craven testified that, after they spoke on the porch, Chief Patrick entered the house without her consent, and asked her to follow him. Once inside, Chief Patrick told her that she needed to cooperate. She acknowledged that, at that point, she gave her oral consent for the police to search the house, but she also stated that she felt that she had no choice but to consent.

Craven also stated that Chief Patrick had falsely testified that she had signed the consent-to-search form before the police reentered the house after Snell's arrest. Craven did not deny that she signed the consent form but testified that she signed the form at the police station after Snell was arrested and the drugs had been seized. She testified that she had gone to the police station after Snell's arrest to retrieve the $894 seized along with the illegal drugs. Craven testified that the $894 was composed of her and Snell's income-tax refunds and government stimulus money.

The defense offered into evidence a video from the body-worn camera of one of the sheriff's deputies who assisted in Snell's arrest.[2] The video was approximately 16 minutes in length and began recording shortly after 10:27 a.m. However, the defense told the trial court that it sought to introduce only the portion of the video in which Craven appears. The defense started playing the video at 48 seconds after

---

[2]     Chief Patrick testified that the City of Hubbard Police Department does not use body-worn cameras.

10:39 a.m. (10:39:48) and continued playing it until 10:43:06. The trial court ruled, "[The] portion [of the video] that the Court's reviewed, from 10:39:48 to 10:43:06, is admitted."

The portion of the video admitted into evidence begins with the officers entering the bedroom where Snell and Craven are located. The video shows Chief Patrick arresting Snell and leading him out to the patrol car. Craven remained on the porch. Chief Patrick returned to the house. Although barely audible, Chief Patrick appeared to say Craven's first name as he and Constable Armstrong entered the house. Craven followed behind them inside. The deputy with the body-worn camera remained on the porch. The video shows Craven inside the house, turning around to speak with someone, but her voice is inaudible. The deputy then stepped away, and Craven is out of view. The deputy remained on the porch for about 40 seconds. He and the other deputy entered the house and proceeded to the bedroom. The video shows Craven handing something to Chief Patrick. Chief Patrick tells the sheriff's deputies that they may leave, and the video ends as the deputies walked toward their vehicle.

In its closing argument, the defense did not challenge the officers' initial entry into the residence. Instead, the defense asserted that the officers' reentry into the residence without a search warrant after Snell's arrest violated his constitutional rights against unreasonable search and seizure and asked that the evidence obtained

7

as a result of the search be suppressed. The defense argued that the voluntary consent exception to the warrant did not apply to the warrantless search because any consent given by Craven was given after the officers had reentered the residence. The defense asserted that the video contradicted Chief Patrick's testimony that Craven signed the consent-to-search form before the officers reentered the residence. The defense further asserted that, to the extent Craven gave her consent, it was not voluntary.

The State responded that "[t]he police had a reasonable belief that Mr. Snell was in the residence based on the fact Ms. Craven told them he was there, sought out their help, invited them over there, and then minutes before, talked to them on the phone [stating] that he was there." The State asserted that the police "knew that the rightful resident of the house [Craven] wanted them over there, so at that point it was reasonable to enter the house." The State pointed out that the evidence showed that Craven wanted Snell out of the house, gave her consent to search, and showed the police where the drugs were located. It also asserted that Craven had "[the] ability to do that, being the person with the apparent authority over the residence."

The trial court did not rule on the motion to suppress at the hearing, stating that it would review the case law and the evidence. Later that same day, the trial court emailed a letter to the parties informing them that Snell's motion to suppress

8

was denied and providing the reasons for the denial. In support of the denial, the trial court also filed the following findings of fact and conclusions of law:

Findings of Fact:

The Court finds that Charidy Craven specifically requested law enforcement to come to her home on the date of the arrest of Keith Snell in this matter in order to both effectuate existing felony warrants on Keith Snell and to recover and remove from said home a quantity of methamphetamine belonging to Keith Snell, due to her concern for the protection and well-being of her children.

The Court finds that Charidy Craven requested officers wait until later in the morning to enter her home so that her children would not be present at the time of entry.

The Court further finds that Charidy Craven did not retract said request and permission to enter her home for both said purposes at any time, nor did any circumstance imply that said permission was withdrawn.

The Court further finds that Charidy Craven gave additional verbal consent to search the home for drugs shortly after the removal of Keith Snell from her home.

The Court also finds that Charidy Craven executed a written Permission to Search said home prior to the search that resulted in the recovery of methamphetamine from the home. Said form contains her signature, a time approximate to the time of the search, and her mobile phone number.

The Court finds that Charidy Craven led officers to her bedroom and handed Chief Patrick a baggie containing methamphetamine that she indicated belonged to Keith Snell. Said baggie was with a box containing methamphetamine, marihuana, and money. Said box was surrounded by personal items of Keith Snell and was located on the side of the bed where Keith Snell was pretending to sleep at the time of his apprehension.

The Court finds that the box from which Charidy Craven retrieved the baggie of methamphetamine also contained United States Currency. The Court further finds that some of said currency in the box was the property of Charidy Craven obtained as stimulus funds and was placed in the box by Keith Snell.

The Court finds that felony warrants existed for the arrest of Keith Snell at the time of the entry into the home.

Conclusions of Law:

The Court concludes that the entry into the home resulting in the arrest of Keith Snell was legal and conducted in accordance with law. The initial permission to enter and search, given several hours earlier, was legally sufficient for the entry into the home, and continued throughout the encounter, which comprises a single entry/episode. Said consent was voluntary. The Court concludes that the search of the home after the arrest of Snell was a continuation of the purpose for which officers were granted permission to enter the home by Charidy Craven, and does not constitute a separate entry requiring additional consent, but would be legal even if considered to be a separate entry.

The Court concludes that the felony arrest warrants for Keith Snell were valid and enforceable, and allowed legal entry into the home for the arrest of Keith Snell. The Court further concludes that personal items belonging to Keith Snell, as well as narcotics seized and narcotics paraphernalia, could be removed from the home of Charidy Craven incident to the arrest of Keith Snell.

The Court concludes that the oral consent and permission to search given by Charidy Craven at the home after the arrest of Keith Snell was voluntary and legally sufficient, albeit unnecessary due to the previous consent, to allow the search conducted which resulted in the recovery of the methamphetamine.

The Court concludes that the written consent and permission to search given by Charidy Craven at the home after the arrest of Keith Snell was voluntary and legally sufficient, albeit unnecessary due to either or both of the previous consents, to allow the search conducted which resulted in the recovery of the methamphetamine.

10

At trial, the jury found Snell guilty of possession with intent to deliver at least one gram but less than four grams of methamphetamine. *See* TEX. HEALTH & SAFETY CODE §§ 481.102(6), 481.112(c). Snell pleaded true to the two enhancement paragraphs, and, after finding the paragraphs to be true, the trial court sentenced Snell to 60 years in prison. *See* TEX. PENAL CODE § 12.42(d).

Snell now appeals the judgment of conviction. In two issues, Snell challenges the trial court's denial of his motion to suppress.

## Denial of Motion to Suppress

We begin with Snell's second issue in which he argues that the trial court erred by denying the motion to suppress because the evidence did not support the trial court's determination that Craven had voluntarily consented to the search.

### A. Legal Principles: Consent to Search

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. amend. IV; *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011). A search, as in this case, conducted without a warrant based on probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011). Once a defendant has shown that a warrantless search or seizure has occurred, the burden shifts to the State to prove that an exception to the warrant requirement applies. *Igboji v. State*, 666 S.W.3d 607, 613 (Tex. Crim. App. 2023).

One such exception is voluntary consent. *Meekins*, 340 S.W.3d at 458. The validity of a consent to search is a question of fact to be determined from all the circumstances. *Id.* A person's consent to search can be communicated to law enforcement in a variety of ways, including by words, action, or circumstantial evidence showing implied consent. *Id.*; *see Sullivan v. State*, 622 S.W.3d 415, 418 (Tex. App.—Waco 2020, pet. ref'd).

"'Reasonableness' is the touchstone for the Fourth Amendment; 'reasonableness' is also the touchstone for determining voluntary consent to search." *Meekins*, 340 S.W.3d at 459. The United States Supreme Court has explained that "the standard for measuring the scope of consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "In other words, courts review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen." *Meekins*, 340 S.W.3d at 459.

"[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Id.* at 458–59. "The ultimate question is whether the person's will has been overborne and his capacity for self-determination critically impaired, such that his consent to search

12

must have been involuntary." *Id.* at 459 (internal quotation marks and brackets omitted). The State must prove by clear and convincing evidence that the consent was freely and voluntarily given. *Sullivan*, 622 S.W.3d at 418 (citing *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007)). In determining that issue, we assess the totality of the circumstances from the point of view of an objectively reasonable person. *Id.* (citing *Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012)).

## B.     Procedural Default

Snell argues that the evidence obtained as a result of the search should have been suppressed because Craven did not voluntarily consent to the police's reentry into the residence after his arrest. *See Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010) (recognizing that entry into residence by police officers is "a 'search'" for purposes of Fourth Amendment, but owner's or occupant's voluntary consent makes that entry constitutionally "reasonable"). Snell argues that the consent-to-search form signed by Craven could not provide a basis to permit the warrantless search because evidence, particularly the video, showed that Craven did not sign the form until after the search. Snell also asserts that Craven's oral consent, given after the officers reentered the residence, was not voluntary because Craven testified that she felt that she had no choice but to consent after police told her to cooperate.

We note that, in its conclusions of law, the trial court stated that Craven's written consent and her oral consent after Snell's arrest—that is, the two instances of consent challenged by Snell—were "legally sufficient, *albeit unnecessary*" to establish that the search, resulting in the seizure of the drugs, was lawful. (Emphasis added.) The trial court indicated that Craven's written and post-arrest consents were "unnecessary" because the court also found that Craven had initially consented to the search when she contacted the police early that morning and asked them to come to her residence to arrest Snell and remove the illegal drugs. Regarding that initial consent, the trial court made the following findings of fact and conclusions of law:

> Craven specifically requested law enforcement to come to her home on the date of the arrest of Keith Snell in this matter in order to both effectuate existing felony warrants on Keith Snell and to recover and remove from said home a quantity of methamphetamine belonging to Keith Snell, due to her concern for the protection and well-being of her children.
>
> . . . .
>
> The Court further finds that Charidy Craven did not retract said request and permission to enter her home for both said purposes at any time, nor did any circumstance imply that said permission was withdrawn.
>
> . . . .
>
> The Court concludes that the entry into the home resulting in the arrest of Keith Snell was legal and conducted in accordance with law. The initial permission to enter and search, given several hours earlier, was legally sufficient for the entry into the home, and continued throughout the encounter, which comprises a single entry/episode. Said consent was voluntary. The Court concludes that the search of the home after the arrest of Snell was a continuation of the purpose for which officers

14

were granted permission to enter the home by Charidy Craven, and does not constitute a separate entry requiring additional consent, but would be legal even if considered to be a separate entry.

On appeal, Snell does not challenge these findings and conclusions. Snell challenges only the lawfulness of the search based on Craven's written consent and her oral consent given at the residence after Snell's arrest.

We must uphold a trial court's ruling on a motion to suppress if the ruling is correct under any theory of law applicable to the case. *State v. Copeland*, 501 S.W.3d 610, 612–13 (Tex. Crim. App. 2016). "A 'theory of law' is applicable to the case if the theory was presented at trial in such a manner that the appellant was fairly called upon to present evidence on the issue." *Id.* at 613. "If the appellant fails to argue a 'theory of law' applicable to the case on appeal, that argument is forfeited." *Id.* An appellant procedurally defaults a theory of law applicable to the case if the appellant fails to advance that argument on appeal. *See id.* at 614. Under these circumstances, the court of appeals will uphold the trial court's ruling without considering the merits of the unchallenged basis for the ruling. *Mixon v. State*, 523 S.W.3d 765, 767–68 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd); *see id.* at 769 (affirming denial of motion to suppress because appellant had procedurally defaulted on appeal "by not advancing an argument on appeal concerning a theory of law applicable to the case," that is, by not attacking both theories of law advanced by State, which were litigated by parties and relied on by trial court to support its denial of suppression

15

motion); *State v. Aviles*, No. 10-07-00371-CR, 2008 WL 976955, at \*1–2 (Tex. App—Waco Apr. 9, 2008, no pet.) (mem. op., not designated for publication) (explaining that, because State, as appellant, failed to challenge each ground for trial court's ruling granting motion to suppress, issue was waived); *see also Marsh v. State*, 343 S.W.3d 475, 479 (Tex. App.—Texarkana 2011, pet. ref'd) ("An appellant must attack all independent grounds supporting a trial court's ruling.").

Here, at the suppression hearing, the State and the defense adduced evidence about Craven's initial consent given when she contacted police early that morning. The State elicited testimony from Chief Patrick that Craven had "called the Hubbard Police Department and invited the police over to her residence." Chief Patrick testified that Craven had called Sergeant Monthey on the morning of Snell's arrest to inform them that Snell had outstanding arrest warrants and that he had illegal drugs at the residence. Chief Patrick testified that Craven "was [in] fear" and wanted Snell removed from the house. Chief Patrick said that Craven called Sergeant Monthey a second time while the officers were en route to her residence to inform them that Snell was at the residence.

The defense elicited testimony from Craven that she never called Sergeant Monthey that morning as Chief Patrick had testified. Craven acknowledged that she met in person with Sergeant Monthey in the early morning hours, but she said that she did not give her consent to search at that time. When asked, she agreed that, at

16

the meeting, she was "encouraged to cooperate" with the police. She also agreed that her children were "mentioned" and that she did not feel that she had any choice but to cooperate with the police.

The State also elicited testimony from Craven that her aunt had arranged for her to meet with Sergeant Monthey. Her aunt told her that the police planned to arrest Snell on his warrants. Craven's aunt indicated that the police had information "that could get [Craven's] kids taken away from [her]." Craven testified that her aunt expressed concern that, when the police came to arrest Snell, they would find "dope" in the house along with Craven's children. Craven explained that her aunt had convinced her to talk to Sergeant Monthey because she needed "to do the right thing." She testified that she "did not approve of" Snell keeping illegal drugs in the house because she had young children, and she did not approve of his drug use because it caused him not to "make the best decisions."

We conclude that the issue of whether Craven consented to the search during her contact with police early that morning was a theory of law applicable to the case because Snell was "fairly called upon to present evidence on the issue," and he actually did so. *See Copeland*, 501 S.W.3d at 613. In addition, the trial court expressly based its ruling on this consent. Under these circumstances, Snell was "aware (or should have been)" that by losing on his motion to suppress, he would need to argue on appeal that Craven did not voluntarily consent to the search when

17

she contacted the police that morning before they arrived at her residence. *See Copeland*, 501 S.W.3d at 614; *Mixon*, 523 S.W.3d at 769. But Snell has not challenged that theory of law on appeal. Thus, Snell has procedurally defaulted by not advancing an argument on that theory, and we must uphold the trial court's denial of the motion to suppress without considering the merits of the unchallenged basis for the ruling. *See Copeland*, 501 S.W.3d at 614; *Mixon*, 523 S.W.3d at 769; *see also Puente v. State*, No. 13-20-00014-CR, 2021 WL 2461173, at \*7 (Tex. App.—Corpus Christi–Edinburg June 17, 2021, pet. ref'd) (mem. op., not designated for publication) ("Puente has not challenged all grounds relied upon by the trial court in denying his motion to suppress; accordingly, he cannot show that the trial court erred in denying his motion.").

## C. Record Supports Trial Court's Findings

Even if we assume that Snell has not procedurally defaulted, the evidence supported the trial court's finding that Craven voluntarily consented to the search by contacting the police and requesting that they come to her residence to arrest Snell and remove the illegal drugs.

### 1. *Standard of Review*

"We review a trial court's denial of a motion to suppress for an abuse of discretion and apply a bifurcated standard of review, affording almost complete deference to the trial court's determination of historical facts, especially when those

18

determinations are based on assessments of credibility and demeanor." *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016). "At a hearing on the motion, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Ex Parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). We review de novo legal questions and mixed questions that do not turn on credibility and demeanor. *See State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). "The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023).

Because issues of consent are necessarily fact intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. *Meekins*, 340 S.W.3d at 460. That is to say, "the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id.* (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)).

### 2. *Analysis*

As mentioned, a person's consent to search can be communicated to law enforcement in a variety of ways, including by words, action, or circumstantial evidence showing implied consent. *Id.* at 458; *see Johnson v. State*, 226 S.W.3d 439,

19

441 (Tex. Crim. App. 2007) (reasoning that calling 9-1-1 and asking for police assistance constituted implied consent for police to enter defendant's home and investigate homicide); *Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (holding that hand gesture made towards officer was sufficient consent for officer to enter defendant's home).

Here, the evidence showed that Craven contacted the police in the early morning hours preceding Snell's arrest to inform them that Snell had active warrants and possessed illegal drugs. She told Sergeant Monthey that she wanted Snell removed from her home because she was in fear. Craven testified that she met in person with Sergeant Monthey at the police station. Craven's testimony indicated that the meeting was about not only removing Snell from the house but was also about the removal of the illegal drugs. Craven testified that she disapproved of Snell having illegal drugs in the house because she had young children. And she indicated that she decided to contact police because she was concerned that her children could be removed from her care because of the illegal drugs if they were found when police came to arrest Snell on the active warrants. Thus, the evidence supported the trial court's finding that "Craven specifically requested law enforcement to come to her home on the date of the arrest of Keith Snell" not only to "effectuate existing felony warrants on Keith Snell" but also "to recover and remove from said home a quantity of methamphetamine belonging to Keith Snell, due to her concern for the protection

20

and well-being of her children." Craven testified that she did not consent to the search during her meeting with Sergeant Monthey, but the trial court, as the trier of fact, was permitted to disbelieve her testimony on this point. *See Hutchins v. State*, 475 S.W.3d 496, 500 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (explaining that, when defendant denies consent was provided in contravention of officer's testimony, trial court's determination turns on witness credibility).

The evidence also supported the trial court's determination that Craven's consent was voluntary. As noted, consent must not be "coerced, by explicit or implicit means, by implied threat or covert force." *Meekins*, 340 S.W.3d at 458–59. The State must prove by clear and convincing evidence that the consent was freely and voluntarily given. *Sullivan*, 622 S.W.3d at 418. The evidence showed that Craven, whether through her aunt or by calling Sergeant Monthey, initiated contact with the police about Snell, his active warrants, and the illegal drugs in her home. The evidence showed that her motivation for wanting both Snell and the drugs removed from her home was concern for her children.

Suggesting that her consent was involuntary, Craven testified that she felt like she had no choice but to cooperate because her children were "mentioned" during her meeting with Sergeant Monthey and she was encouraged to cooperate with police. However, the evidence showed that, at that point, she had already decided to cooperate with police because she had initiated contact with them. Nothing in the

record contradicts that or shows that the police threatened or coerced her into cooperating. Craven indicated that her aunt warned her that her children might be removed from her care if the police found drugs in the home when they arrested Snell, and she testified that her aunt convinced her to "do the right thing" by cooperating with the police. This evidence showed that Craven was not motivated by the police to cooperate but instead was motivated to take action to protect herself and her children due to the circumstances in which she found herself with Snell in her home.

In addition, the evidence supported the trial court's finding of fact that Craven never withdrew her consent. *See Miller v. State*, 393 S.W.3d 255, 266 (Tex. Crim. App. 2012) (providing that person who consents to law enforcement entry "may specifically limit or revoke his consent"). The body-worn camera video showed Craven during the period from Snell's arrest until Chief Patrick reentered the house. The video showed Chief Patrick lead Snell to the patrol car while Craven looks on from the porch. Chief Patrick returned immediately to the porch, appeared to say Craven's name, and walked into the house with Craven following him. At no point during that time did Craven withdraw her consent or limit the scope of her consent. *See Valtierra*, 310 S.W.3d at 449 ("[A] person is free to limit the scope of the consent that he gives, but a person's silence in the face of an officer's further actions may imply consent to that further action." (footnote omitted)). The trial court's finding

22

that Craven's consent was not withdrawn supports the court's conclusion of law that the search of the residence after Snell's arrest "was a continuation of the purpose for which officers were granted permission to enter the home by Charidy Craven, and does not constitute a separate entry requiring additional consent, but would be legal even if considered to be a separate entry." *See Morrison v. State*, 508 S.W.2d 827, 829 (Tex. Crim. App. 1974) (holding that that consent originally given to police officers carried over from their first entry into residence to their second entry).

Viewing the totality of the circumstances in the light most favorable to the ruling, we conclude that the evidence supported the trial court's determination that, when she spoke with Sergeant Monthey in the early morning hours, Craven voluntarily consented to the search of the residence, including the officers' reentry into the residence to remove the illegal drugs.[3] We hold that the trial court did not abuse its discretion when it denied Snell's motion to suppress.

---

[3] Because this determination supports the trial court's denial of the suppression motion, we need not address Snell's challenges to the trial court's findings that Craven voluntarily consented to the search by giving her oral consent after Snell's arrest and by signing the consent-to-search form. In any event, we note that, while Snell is correct that the video shows that Craven did not sign the consent-to-search form on the porch as Chief Patrick testified, the evidence nonetheless supported the trial court's finding that she signed the consent form "prior to the search that resulted in the recovery of methamphetamine from the home." The consent form reflected that Craven had signed it at 10:30 a.m., and the portion of the video admitted at the hearing, showing Snell's arrest and the subsequent search, started at 10:39 a.m. Thus, based on the evidence admitted at the hearing, the trial court could have reasonably inferred that Craven signed the consent-to-search form before Snell's arrest. The evidence also supported the trial court's determination that Craven's oral consent, given after Snell's arrest, was voluntary despite Craven's claim that she

We overrule Snell's second issue.

## Burden of Proof

In his first issue, Snell contends that the trial court "did not require the State to carry the burden of proof for a warrantless search and seizure." As noted, once a defendant has shown that a warrantless search or seizure has occurred, the burden shifts to the State to prove that an exception to the warrant requirement applies. *Igboji*, 666 S.W.3d at 613. Here, Snell asserts that, after he established that the search was without a warrant, the trial court did not require the State to carry that burden.

Addressing burden of proof, the following exchange occurred at the beginning of the suppression hearing:

> [The defense]: Your Honor, it's our position that since this was warrantless search, that the burden is on the State.
>
> [The State]: If there's evidence that shows that then the burden does shift. It's Defendant's motion.
>
> THE COURT: Well, let's go far enough to establish the basics and then the Court will determine whether or not the burden shifts.

---

felt that she had no choice but to comply because the officers told her that she needed to cooperate. As mentioned, the evidence showed that Craven had been cooperating with police. Her contact with police earlier that morning had been the catalyst for the police coming to her residence that particular morning to arrest Snell and seize the drugs. The video showed Craven's demeanor as she interreacted with police both before and after she gave her verbal consent. From the evidence, the trial court could have reasonably inferred that Craven's consent was voluntary. And, assessing Craven's credibility, the trial court was free to disregard her testimony that she felt that she had no choice but to cooperate.

When the defense said that it did not hear the court's statement, the trial court said, "[L]et's go ahead and get enough evidence in so the Court can determine whether or not the facts are sufficient to shift the burden. And then if it does, the Court will make such a finding and we'll go from there." The defense then called Chief Patrick.

On direct examination, Chief Patrick testified that Snell had two active felony warrants. He stated that he and other officers went to the residence to arrest Snell on the warrants. Chief Patrick confirmed that he had not obtained a search warrant before entering the residence. Rather than passing the witness at that point, the defense continued to question Chief Patrick. The defense elicited testimony from him that Craven had called the police that morning stating that she "was tired of Mr. Snell being in the residence" and that "she knew that he had active warrants and was also in possession of narcotics." Chief Patrick testified that Craven had signed a consent-to-search form before the police reentered the residence.

The defense passed Chief Patrick as a witness, and the State cross-examined him. Through Chief Patrick, the State introduced the consent-to-search form signed by Craven. Chief Patrick testified that Craven had called Sergeant Monthey stating that she "was in fear" of Snell and that she "wanted [him] removed out of the house." He said that Craven told Sergeant Monthey that Snell had active felony warrants and illegal drugs. Chief Patrick confirmed that Craven had invited the officers to her

25

residence. He said that Craven called Sergeant Monthey while they were en route to the residence and confirmed that Snell was there. Chief Patrick also testified that Craven signed the consent-to-search form before he reentered the residence after Snell's arrest. He stated that, when they reentered the residence, Craven directed them to the box in the bedroom indicating that it contained illegal drugs.

The defense then called Craven to testify and introduced the portion of the video in which Craven appeared. Craven testified that she had signed the consent-to-search form at the police station after the search was completed. She also testified that she gave Chief Patrick verbal consent to search her residence but that she had done so after the police reentered the residence and told her that she needed to cooperate. Craven testified that she had met with Sergeant Monthey in the early morning hours before Snell's arrest but did not consent to the search then.

On the State's cross-examination, Craven acknowledged that she did not approve of Snell having illegal drugs in the house because she had young children. She testified that she met with Sergeant Monthey about turning in Snell at her aunt's urging. She indicated that she feared that her children would be taken from her if the police came to arrest Snell and found drugs in her home.

During closing arguments, the defense asserted that the State needed to prove by clear and convincing evidence that Craven's consent to search the residence was

26

voluntary. In its argument, the State pointed to evidence showing that Craven had consented to the search both orally and in writing.

On appeal, Snell asserts that, once Chief Patrick testified that the officers did not obtain a search warrant, the trial court "was required to shift the burden of proof to the State; however, the court never did." He points out that the trial court did not make a finding about the shifting of the burden as it indicated it would. Snell asserts that the "burden of proof was improperly placed upon him." He complains that he was required to engage in direct examination of both witnesses giving the State "the benefit of cross-examination, i.e., leading."

We note that "[t]he party with the burden of proof normally opens and closes the presentation of evidence." *Harrison v. State*, 179 S.W.3d 629, 633 (Tex. App.—Beaumont 2005, pet. denied). However, at no point did Snell object to the order of the presentation of the witnesses. To the contrary, after Chief Patrick testified that the search was without a warrant, Snell continued without pause to question him, eliciting testimony about Craven's consent to search the residence. And, rather than resting after Chief Patrick's testimony, Snell called Craven to testify.

Other than the order of the witnesses' presentation, Snell points to nothing in the record indicating that the trial court misallocated the burden of proof in determining that the motion to suppress should be denied. *Cf. Hunter v. State*, 607 S.W.3d 894, 897 (Tex. App.—Amarillo 2020, no pet.) (describing as "inaccurate"

trial court's conclusion of law, which stated that "[t]he initial burden at a suppression hearing [was] on the Defendant to rebut the statutory presumption of voluntariness" for consent to submit to blood draw). Instead, as shown by the discussion between the parties and the trial court at the start of the suppression hearing and as shown by the parties' closing arguments, the trial court and the parties knew that the burden shifted to the State once Snell established that it was a warrantless search. The State's recognition that it had the burden of proof was also demonstrated by its questioning of the witnesses on the issue of consent and by the evidence it offered, such as the consent-to-search form signed by Craven.

Finally, the trial court's findings of fact and conclusions of law reflect that the trial court denied the suppression motion based on the evidence relied on by the State showing that Craven voluntarily consented to the search. In other words, the findings and conclusions reflect that the trial court denied the motion because the State had met its burden to affirmatively show voluntary consent. The findings and conclusions do not indicate that the trial court denied the motion because Snell had failed to meet an incorrect burden of proof of disproving voluntary consent. Thus, the trial court's findings of fact and conclusions of law show that the trial court did not misallocate the burden of proof in denying the suppression motion.

We overrule Snell's first issue.

28

## Conclusion

We affirm the judgment of the trial court.

 

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).